**UNITED STATES**
v.
**AMERICAN DIE & INSTRUMENT WORKS, Inc.**
**No. 11269.**

United States Court of Appeals, Third Circuit.

Argued April 8, 1954.

Decided May 27, 1954.

Robert E. Kline, Pittsburgh, Pa., for appellant.

Joseph M. Howard, Washington, D. C. (H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, David L. Luce, Dickinson Thatcher, Sp. Assts. to the Atty. Gen., John W. McIlvaine, U. S. Atty., D. Malcolm Anderson, Jr., Pittsburgh, Pa., Asst. U. S. Atty., on the brief), for respondent.

Before GOODRICH, KALODNER, and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

Cases like this are uncommon. They should not occur at all. For on this appeal we are compelled to reverse a conviction of crime, which was supported by substantial evidence, because of the many improper things said and done by the special prosecutor who tried the case for the United States.

The indictment, charging income tax evasion, was tried to a jury with protracted examination and cross-examination of prosecution and defense witnesses about the income, expenses and accounts of a business over a number of years. Throughout the trial the prosecutor repeatedly interrupted his opponent's interrogation of witnesses, inevitably diverting the attention of the jury, by heckling comments and improper suggestions. The following examples are illustrative of the many such improprieties scattered throughout the record.

Displeased with a line of questioning, the prosecutor interrupted defense counsel with this suggestion: "Just ask him if he will answer yes to anything you ask." When defense counsel introduced a restatement of a question by saying, "I want to frame this question correctly," the prosecutor observed, "After listening to me you should get it correct." When defense counsel explained that the purpose of certain questioning was "to tie that all up" the prosecutor volunteered the prediction that the witness "will tie himself up." When defense counsel inquired whether the members of the jury were able to see certain material being exhibited to them, the prosecutor interrupted to say, "Maybe they don't want to look at it."

Beyond this, from time to time the prosecutor derided, badgered, and attempted to browbeat opposing counsel and witnesses in most extraordinary fashion. When, after a colloquy, defense counsel agreed to withdraw a question, the prosecutor's open court comment was "Every time he runs into a brick wall, he withdraws." He derided the documentary material assembled by the defense by saying: "Now to expedite this, would counsel please take out of this debris any years other than 1945 * * *." His cross-examination of witnesses became choleric and accusatory. Addressing one witness: "* * * You can't scare me by glaring at me. * * *" To another: "You sneered at me in the hall." To a third: "You had better keep your seat, brother." And to opposing counsel: "You are not running me off of any spot, Mister." To still another witness: "I know you are an 'eager beaver' but I would like to get in a question." When defense counsel objected that in cross-examination the prosecutor "is yelling right down at his ear * * * rattling the witness"—the retort was, "He is already rattled." Perhaps the worst of these verbal assaults appears in this interchange:

Prosecutor to Defense Counsel: "Go and sit down."

Defense Counsel: "I will stand up if I want to stand up * * * and you can't tell me to sit down. You are being unmannerly."

Prosecutor: "I wonder how unmannerly I will get with you."

In all, appellants have set out in their Appendix forty-eight examples of alleged improprieties of the prosecutor while the evidence was being introduced. Some of the things said, like those quoted above were obviously improper. Others were trivial to the point of being inconsequential, if considered individually. But pervading the hearing as they did they must have disrupted and impeded the orderly presentation and rational consideration of the evidence. A trial is an adversary proceeding and may properly be contested with vigor and spirit. But it must not become a Donnybrook Fair during which evidence cannot be properly presented and the brawling of counsel diverts the jury from the serious business of comprehending, remembering and mentally organizing the testimony. In this connection it has been urged by the government that the conduct of defense counsel was not exemplary and that some of the excesses of the prosecution were provoked. If that is true, then the trial had degenerated even more than we have indicated. In any event we think it clear that the trial judge, who did no more than interpose occasional mild admonitions interspersed with assurances that he regarded counsel on both sides as fine gentlemen, let the trial get too far out of hand.

But the worst was yet to come. The closing argument gave counsel an opportunity to summarize and present in perspective the strong case the government could make on the record. Indeed, the prosecutor seemed to recognize this when he began his closing presentation by promising "to discuss the issues in this case in a cool, calm dispassionate manner." But less than one hundred words later he plunged into a diatribe, featuring corruption in Washington and introduced by the statement in feigned southern accent, "Perhaps you-all are familiar with Mr. Theron Caudle." Nothing is to be gained by restating in detail the irrelevant discussion of the "mess in Washington" and "in other places" which fol-

lowed. It is enough to say that this improper beginning served as a frame of reference for a subsequent charge, itself equally improper because unsupported by evidence, that an attempt had been made to " 'fix' this case." That in turn was followed by a warning to the jury that if defendants' accountants "can get away with this one, there will be a lot of 'messes' that they will be hired to clear up." In this connection it merits mention that at some points the summation was nothing but a lampooning of these accountants: for example, "Now the Boy Wonder, Mr. Schietinger, never mentioned that $6,801.02, nor the Bull of the Pampas, Mr. Sauer—'S' and 'S', smooth, slick, slippery, they all start with 'S'—the gentlemen who have built up this case. * * *"

The closing argument also exceeded all bounds of propriety in an attack upon the twenty character witnesses who had testified to the good reputation of the defendants. In attempting to make the legitimate point that wrongdoers sometime enjoy a good reputation, counsel dramatized the career of Alger Hiss, with comment and sinister innuendo as to his role at Yalta and in the formation of the United Nations at San Francisco. Dealing more directly with the character witnesses in this case, the prosecutor first described them as "well trained" and "well schooled" and then inquired rhetorically, "Oh God, why is there perjury in this world?" Yet, the record does not suggest in any way that the character witnesses had misrepresented the reputation of the defendants.

More generally the pattern of this closing, in so far as it had pattern, seems to have been a dramatic representation of the prosecutor, the trial judge and the jury as engaged against odds in the combatting of evil on a very broad front. This involved an excoriation of wrongdoers so comprehensive as to include the expression of very dim views as to the character and ability of the bench and the bar. The jury was told that "There are not so many learned, wise, courageous judges, sitting on the bench today."

Immediately thereafter tribute was paid to the sitting judge as a distinguished exception. As to the bar, after the prosecution had identified himself with the great "oldtime lawyers," he deplored the "new group of lawyers growing up, men who hide and hinder and hamper and secrete and evade and avoid and mislead juries," leaving it to be implied that defense counsel belonged among these perverse moderns.

Finally, this speech had a peroration. It concluded with an exhortation that the jury "may be inspired with some of the courage and the wisdom and the foresight of our great President, when he promised the people of the United States that he would 'clean up the messes' wherever he found them." This was the final word in the argument of a case where there had been no evidence of either actual or attempted corruption of officials in connection with defendants' tax liability.

At the conclusion of this speech the trial judge denied a motion for a mistrial. And he made no effort to minimize or correct the prejudicial effect of any part of what the jury had just heard.

In many cases it is difficult to decide whether there has been a serious enough deviation from fairness and propriety in the conduct of a trial to warrant the upsetting of a verdict which otherwise is supported by the evidence. But here there were obvious flagrant departures from fairness and so many improprieties that we have not even tried to enumerate them. The record of what was said and done at this trial is much too bad to let any conviction stand upon it.

A separate contention has been made on behalf of the defendant, Charles F. Schmidt, that on the evidence his acquittal was mandatory. He was convicted under Section 145(b) of the Internal Revenue Code, 26 U.S.C.A. § 145(b), of a wilful attempt to evade income taxes owed by a corporation by causing false and fraudulent corporate returns to be filed. He now argues he could be convicted at most of the lesser offense of aiding in the preparation of a false return. However, there was evidence that he was the secretary of the corporation and responsible for the keeping of its books and the preparation of its income tax returns. We are satisfied that the evidence of his role in the evasion of corporate taxes was sufficient to go to the jury on the charge made against him in the indictment.

The judgment must be reversed and the cause remanded for a new trial.