THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. MICHAEL ORECCHIO, DEFENDANT-RESPONDENT.

Argued May 24, 1954—Decided June 28, 1954.

*Mr. David H. Harris,* Special Deputy Attorney-General, argued the cause for the appellant (*Mr. Grover C. Richman, Jr.,* Attorney-General, and *Mr. Harold Kolovsky,* Deputy Attorney-General, attorneys).

*Mr. Albert S. Gross* argued the cause for the respondent (*Kapp Brothers,* by *Leon W. Kapp,* attorney, and *Mr. Herman W. Kapp,* of counsel, on the brief).

The opinion of the court was delivered by

JACOBS, J. The Appellate Division, without dissent, directed that the defendant be granted a new trial because of the many legal errors during his first trial which resulted in judgment of conviction. See 27 *N. J. Super.* 484 (1953). We granted certification on the State's application. See 14 *N. J.* 352 (1954).

 The sound administration of criminal justice in our democracy requires that both the end and the means be just. The accused, no matter how abhorrent the offense charged nor how seemingly evident the guilt, is entitled to a fair trial surrounded by the substantive and procedural safeguards which have stood for centuries as bulwarks of liberty in English speaking countries. This, of course, does not mean that the incidental legal errors, which creep into the trial but do not prejudice the rights of the accused or make the proceedings unfair, may be invoked to upset an otherwise valid conviction; under these circumstances it would be grossly unjust to the State and its people to grant a new trial, and in recent days this court has not hesitated to deny such relief to the defendant. See *State v. LeFante*, 14 *N. J.* 584 (1954); *State v. Witte*, 13 *N. J.* 598 (1953), *certiorari* denied 347 *U. S.* 675, 74 *S. Ct.* 675; *State v. Vaszorich*, 13 *N. J.* 99 (1953), *certiorari* denied 346 *U. S.* 900, 74 *S. Ct.* 219, 98 *L. Ed.* 400 (1953). But *cf. Knowlton, Criminal Law and Procedure*, 8 *Rutgers L. Rev.* 78, 87 (1953). Where, however, the legal errors are of such magnitude as to prejudice the defendant's rights or, in their aggregate have rendered the trial unfair, our fundamental constitutional concepts dictate the granting of a new trial before an impartial jury. We are satisfied, as was the Appellate Division, that the present case falls within the latter category; and this being so, our own views as to whether the evidence established the defendant's guilt are no longer material. See *Weiler v. United States*, 323 *U. S.* 606, 611, 65 *S. Ct.* 548, 551, 89 *L. Ed.* 495, 499 (1945), where Justice Black in an opinion delivered for a unanimous court said:

"We are not authorized to look at the printed record, resolve conflicting evidence, and reach the conclusion that the error was harmless because we think the defendant was guilty. That would be to substitute our judgment for that of the jury and, under our system of justice, juries alone have been entrusted with that responsibility."

The defendant Michael Orecchio was Chief of County Detectives in Bergen County and, as such, was charged with the duty of using proper and diligent means to detect law violations, gather evidence, make arrests and submit appropriate reports to his superiors empowered to seek indictments and obtain convictions. *State v. Winne*, 12 *N. J.* 152 (1953); *State v. Marchese*, 14 *N. J.* 16 (1953). The indictment against him charged, in 35 counts, that he had willfully failed to use and exercise all proper, reasonable, effective and diligent means for the detection, apprehension, arrest and conviction of persons who maintained gambling establishments at designated premises within the county. There were dismissals or acquittals on all counts except the first three upon which the jury returned verdicts of guilty; the first count related to 2075 Lemoine Avenue, Fort Lee, the second related to Costa's Barn on Route 6 in Lodi, and the third related to 1010 Palisade Avenue, Fort Lee. The trial court sentenced the defendant to a period of not less than two nor more than three years in the New Jersey State Prison and thereafter the defendant took his appeal to the Appellate Division. He alleged numerous trial errors, some of which were discussed in the opinion of Judge Bigelow below. See 27 *N. J. Super.* 484.

I.

Shortly before March 3, 1952, the date set for trial, the defendant moved that his trial be delayed to permit "the public excitement to subside and the mind of the community to become tranquilized." In support of his request he referred to several items calculated to prejudice his opportunity for an impartial trial. On January 31, 1952 a large sign had been erected near the Bergen County Court House

and was observable from the jury room; it bore statements by public officials that law enforcement in Bergen County was a "sorry spectacle" and that the county was a province of the underworld protected by "corrupt public officials." On February 7, 1952 the Bergen County grand jury issued a public presentment which charged that the "bookmaking racket could not have existed without the active co-operation of officialdom at all levels." And on February 20, 1952 a Deputy Attorney-General participated in a television broadcast which discussed the "widespread and syndicated gambling" in the county and the failure of the public officials to stop it. The defendant's motion was denied and the Appellate Division found that this action did not constitute an abuse of its discretion. It stressed, however, that the described incidents had occurred but shortly before the date set for trial and that the situation was such as to call specially upon "counsel for the State, as well as the trial court, to avoid adding to any prejudice against the defendant that might interfere with a fair trial"; the legal errors are to be considered in the light of this admonition. See *Commonwealth v. Balles*, 160 *Pa. Super.* 148, 50 *A. 2d* 729 (*Super. Ct.* 1947); *Delaney v. United States*, 199 *F. 2d* 107 (*C. C. A.* 1 1952).

## II.

During the trial the state offered in evidence 56 separate gambling indictments which had been returned by the Bergen County grand jury. The defendant Orecchio was not named in any of them and many related to alleged offenses at premises other than those listed in the Orecchio indictment and to offenses allegedly committed when Orecchio was no longer in office. Some of the indictments were later *nolle prossed,* others were never brought to trial, still others resulted in convictions which were reversed on appeal, and upon retrials there were acquittals by direction of the court. The defendant objected to the admission of the indictments, but the State urged that it was entitled "to show arrests and

indictments" and the trial court sustained its position. Before the Appellate Division the State contended that "the indictments are evidential to indicate the persons named in the indictments were transgressors of the law during the times charged in the defendant's indictment" and that the indictments were introduced "to evidence that crime, in the form of gambling, did exist at the time when defendant should have performed his duty." Apparently, however, the State has abandoned this position and now contends that the indictments were admitted "as proof tending to show defendant's willful failure to detect available evidence on the basis of which indictments could have been found."

An indictment is evidence only of the fact that a charge has been made; it in no wise establishes the truth of the charge or the presence of sufficient legal proof thereof. As expressed by Justice Case in *State v. Ellenstein,* 121 *N. J. L.* 304, 312 (*Sup. Ct.* 1938), the indictment "proves nothing," "carries no element of guilt" and does not in any degree "take from the accused his presumption of innocence." Similarly, in *Coyne v. United States,* 246 *F.* 120, 121 (*C. C. A.* 5 1917), the court stated that it was "not uncommon for entirely innocent persons" to be indicted and that the indicted person was to be presumed innocent until his guilt was established "by legal evidence beyond a reasonable doubt, in a court of competent jurisdiction." See 3 *Wigmore on Evidence* (*3rd ed.* 1940), § 980(*a*). Although Orecchio's duties included detection, investigation, arrests and reports, they did not include the formal legal steps incident to obtaining indictments and convictions; those steps were the responsibilities of his superiors. It seems clear to us that the 56 indictments, which were obtained well after Orecchio's duties had ended, were not admissible either on the theory advanced in the Appellate Division or the different theory advanced in this court. Indeed, the State's brief makes little effort to support the admissibility of the indictments but devotes itself largely to the contention that, assuming there was legal error, it was non-prejudicial.

When the indictments were received in evidence there were no restrictions imposed as to their use nor were any limitations imposed by the trial court in its charge. On the contrary, the trial court's charge instructed the jury to consider the relevant testimony "as well as the documentary exhibits" (which included the 56 indictments) and to conclude therefrom whether the defendant had knowledge of gambling in the county between the dates charged in his indictment. In *State v. Costa*, 11 *N. J.* 239, 252 (1953), this court recently held that the admission there of gambling indictments against others constituted prejudicial error; the following remarks by Justice Brennan on the issue of prejudice are particularly apt:

"In view of the identity of the offenses with that for which Costa was being tried, and the oral testimony thereof in the record which was already fraught with peril to Costa's rights, these paper writings must be categorized with those the admission of which in other cases we have said was prejudicial error, and this even though the oral testimony contained everything of substance to be gleaned from reading the indictments. *State v. Cleveland*, 6 *N. J.* 316 (1951) ; *State v. Cooper*, 10 *N. J.* 532 (1952). The observation that 'A thing in writing carries, particularly with the layman, a weight of its own * * * [and is] a present and constant reminder to the jury of its contents' and '* * * shears the balance of the oral testimony in the case of the weight it would otherwise have,' *State v. Cleveland, supra*, is particularly appropriate in the circumstances of this case. We cannot escape the conviction that the indictments very probably constituted 'the fulcrum upon which the verdict turned.' *Springer v. Labow*, 108 *N. J. L.* 68 (*Sup. Ct.* 1931). The manifest wrong and injury so clearly done Costa by their admission into evidence fully supports the Appellate Division's reversal of the conviction on that ground. See *State v. Mount*, 73 *N. J. L.* 582 (*E. & A.* 1906) ; *State v. Young*, 93 *N. J. L.* 396, at 403 (opinion following reargument) (*E. & A.* 1919)."

See *State v. Cooper*, 10 *N. J.* 532, at *p.* 555 (1952) ; *State v. Cleveland*, 6 *N. J.* 316, at *p.* 331 (1951).

Who can say that the jury did not fully believe, as the State itself urged before the Appellate Division, that the indictments themselves evidenced widespread gambling during the time when the defendant "should have performed

his duty"; and who can say that the unrestricted presence of their large number in the jury room during its deliberations did not remove any remaining doubts and constitute the "fulcrum" (*State v. Costa, supra*) upon which the jury finally concluded that the defendant should be found guilty on the first three counts? See *Ferry v. Settle*, 6 *N. J.* 254, 258 (1950), where Justice Oliphant in an opinion delivered for this court remarked that if "one had the wisdom of a Solomon it would be insufficient to fathom a jury's collective mind and decide exactly what transpired therein and upon what testimony the jury based its verdict." *Cf. Coulston v. United States*, 51 *F.* 2d 178, 182 (*C. C. A.* 10 1931), where the court adopted an earlier expression in the eighth circuit that since "the appellate court has not insight into the deliberations of the jury room, the presumption is to be indulged, in favor of the liberty of the citizen, that whatever the prosecutor, against the protest of the defendant, has laid before the jury, helped to make up the weight of the prosecution which resulted in the verdict of guilty." However, we need not pursue the issue of whether the error in admitting the indictments, standing alone, would call for reversal, for it is to be considered with the many other trial errors which, in their aggregate, clearly deprived the defendant of the type of trial upon which our system of criminal justice soundly insists. See *State v. Dolliver*, 150 *Minn.* 155, 184 *N. W.* 848, 849 (*Sup. Ct.* 1921) :

"* * * the rule is that where any one of several errors assigned would not in itself be sufficient to warrant a reversal, yet if all of them taken together justify the conclusion that defendant was not accorded a fair trial, it becomes the duty of this court to reverse. *State v. Briggs*, 84 *Minn.* 357, 87 *N. W.* 935; *State v. Almos*, 122 *Minn.* 479, 142 *N. W.* 801."

See also *People v. Strause*, 290 *Ill.* 259, 125 *N. E.* 339 (*Sup. Ct.* 1919); *State v. McLemore*, 101 *Kan.* 259, 166 *P.* 497 (1917); *Commonwealth v. Balles, supra; Brinkley v. State*, 154 *Tex. Cr. R.* 466, 228 *S. W.* 2d 522 (*Crim. App.* 1950). *Cf. United States v. American Die & Instrument Works, Inc.*,

213 *F. 2d* 731, 734 (*C. C. A.* 3 1954), where the third circuit recently reversed a conviction for income tax evasion, saying:

"In many cases it is difficult to decide whether there has been a serious enough deviation from fairness and propriety in the conduct of a trial to warrant the upsetting of a verdict which otherwise is supported by the evidence. But here there were obvious flagrant departures from fairness and so many improprieties that we have not even tried to enumerate them. The record of what was said and done at this trial is much too bad to let any conviction stand upon it."

### III.

■ On February 22, 1949 the defendant assigned two members of his staff (Ducoff and Allyn) to investigate a complaint that gambling activities were being conducted in Lyndhurst by Adamo, Albino, Lamberdis, Settenbrino and Guidd. They later reported no evidence of gambling. One of the witnesses called by the State was County Detective Guidetti, a lifelong resident of Lyndhurst and a member of Orecchio's staff; above objection he was permitted to give sweeping hearsay testimony about the criminal backgrounds of Adamo, Albino, Lamberdis and Settenbrino. He stated that Adamo had been convicted in New York of statutory rape; that he believed Lamberdis had been convicted "on two or three occasions as a still man"; that he believed Settenbrino had been "picked up charged with maintaining a disorderly house, bookmaking"; and that Albino had been "arrested in Lyndhurst, I understand, and in Rutherford for bookmaking." The State's witness Allyn was also permitted, above objection, to testify that Adamo had a criminal record. In the Appellate Division the State sought to sustain the admissibility of the evidence on the ground that it was "descriptive of the business, occupation or pursuit of such individuals, and sought to identify them and their habits." This ground has been abandoned and the State now contends that the evidence was admissible as tending to show that the assignment of Ducoff and Allyn rather than Guidetti to investigate the complaint was not an honest one. We consider

the inference somewhat indirect but are satisfied that, in any event, it is insufficient to justify the admission of the testimony which was not legally competent to establish the specific criminal records of the individuals mentioned. See *Stromberg v. Judge, &c., County of Camden*, 118 *N. J. L.* 387, 389 (*Sup. Ct.* 1937), where the court stated that "conviction of crime is a matter of record" and may not be established by the "mere assertion" of a police officer having no first-hand knowledge.

## IV.

██ One of the State's witnesses was Bakofen, alias Baker, who testified that he, Engels and Vasile had been partners in bookmaking operations in Little Ferry and Hackensack. Above objection, he was permitted to testify at length as to "pay-offs" to unnamed Bergen County officials. He denied that he ever had any relationship whatever with the defendant or that he ever gave him any money or other thing of value. Most of his testimony as to pay-offs seems to have been based, not on his own knowledge, but on information which he said was given him by his partner Engels. Although Engels was in the State's custody and was lodged at the Bergen County jail during a good part of the trial, he was not called upon by the State to testify. In the Appellate Division the State asserted that Bakofen's testimony and an accompanying exhibit "were offered in evidence to show the operation of and the expenditures (pay-offs) of the illegal enterprises at the various addresses recited in the indictment." However, before this court the State asserts that they were offered "not to prove that the defendant was a recipient of 'pay-offs'" but to "show the existence of gambling activity." We are not prepared to accept this explanation with respect to the extensive direct examination dealing with pay-offs. It would seem that this testimony was calculated to leave the jury with the impression that there was widespread and revolting public corruption which may well have engulfed the defendant. It is just this sort of speculation and con-

jecture, in lieu of legal proof, which traditional rules of evidence governing judicial proceedings are designed to exclude. In the light of the State's position that the testimony was not offered to indicate any pay-off to the defendant, we are satisfied that it should have been excluded; and this conclusion is buttressed by the fact that the State sought to prove the pay-offs, not through the witness who allegedly made them and who was readily available for examination and cross-examination, but through another whose information was largely hearsay. See *Kotteakos v. United States*, 328 *U. S.* 750, 761, 66 *S. Ct.* 1239, 1246, 90 *L. Ed.* 1557, 1565 (1946), where Justice Rutledge pointed out that while the rule against hearsay is sometimes artificial it "may be the very essence of justice, keeping out gossip, rumor, unfounded report, second-, third-, or further-hand stories." See also *State v. Niesbbalski*, 82 *N. J. L.* 177, 180 (*Sup. Ct.* 1912); 5 *Wigmore, supra,* § 1367.

## V.

The defendant Orecchio had occupied an office in the prosecutor's suite in the Bergen County Court House. It contained, in addition to chairs and a table, two filing cabinets of three drawers each. On December 1, 1950 the contents of the desk and the filing cabinets were seized by the State and during the trial several hundred papers thus seized were offered in evidence. When the defendant objected, the State took the position that everything found in Orecchio's office was admissible for "whatever value this jury wants to ascribe to it." The papers were admitted without restriction and during the trial court's charge it placed no limitation on its use by the jury in its deliberations. The office was not in the exclusive possession of the defendant; during the day it was customarily open and all members of the prosecutor's staff had ready access; after business hours it was locked, but two detectives as well as the defendant had keys. Many of the papers had, for convenience of storage, been transferred in

1949 from another room into Orecchio's room; they were not addressed to Orecchio and there was no evidence to indicate that he had ever seen or looked at them. Some were received during the tenure of the defendant's predecessor in office and others apparently were the property of the county prosecutor's secretary. It is not disputed that the papers were not admissible to establish the truth of their assertions. See *State v. MacFarland*, 83 *N. J. L.* 474 (*E. & A.* 1912); *State v. Marlinek*, 12 *N. J. Super.* 320 (*App. Div.* 1951). Under a strict evidential view one might take the position, as did the Appellate Division (27 *N. J. Super.*, at *page* 497), that the papers were not actually in the defendant's possession and were therefore not admissible even as tending to prove notice of their assertions. Under a broader evidential view the papers might be admissible simply as tending to prove such notice, leaving the defendant free to deny or explain. *Cf.* 4 *Wigmore, supra,* § 1073; *People v. Halpin*, 276 *Ill.* 363, 114 *N. E.* 932 (*Sup. Ct.* 1917). However, under either point of view it seems clear that the receipt of the papers into evidence without affirmatively protecting the defendant by appropriate restriction of their use by the jury constituted legal error. Neither the State nor the trial court suggested any such limitation and we do not consider that the error was wholly cured by the defendant's omission of a formal motion for limitation.

## VI.

An assistant district attorney of New York County testified that on May 2, 1950 the records and papers of Frank Erickson, a notorious gambler, were seized at his New York office. They included references to another notorious gambler (Frank Costello) and to Bergen County activities, and a 64-page list or inventory of the records and papers was mimeographed and distributed. The witness testified, however, that neither he nor anyone on his behalf ever gave the defendant a copy of the inventory or called it to his attention.

The State offered the inventory and, above objection, it was admitted into evidence without any stated restriction or limitation as to its use. This was erroneous; if the inventory was received as proof of the truth of the statements therein, it clearly constituted inadmissible hearsay. (see *Bower v. State*, 135 *N. J. L.* 564, 566 (*Sup. Ct.* 1947); *State v. Rombolo*, 89 *N. J. L.* 565, 569 (*E. & A.* 1916)); if it was intended simply to evidence that the defendant was aware of its statements but nevertheless took no official action, it is sufficient to point out that no such limitation was placed on it and no foundation whatever was then laid to establish the defendant's knowledge. See 27 *N. J. Super.*, at *page* 498.

## VII.

■ (a). During the trial the State offered in evidence "rogue's gallery" pictures of some of its witnesses; each of these pictures bore a convict's number and the defendant objected on the ground that its introduction had no valid purpose and was calculated to prejudice him. The trial court admitted the pictures into evidence, but since the jury had ample opportunity to observe and identify the witnesses actually on the stand, we consider that the ruling was erroneous. *Cf.* 20 *Am. Jur., Evidence*, § 729, *p.* 609 (1939).

■ (b). During the State's cross-examination of the defendant it offered into evidence notice of charges which had been served by the Attorney-General upon the defendant; above objection the notice was received in evidence and read to the jury. One of the charges was that "on May 19, 1950, at Police Headquarters, Leonia, New Jersey, you did assault and strike one Joseph Walsh, a councilman of said municipality, and thereby did commit an indictable offense." This charge of independent criminality was never proved and had nothing whatever to do with the proceedings; the defendant made a specific request that reference to it be stricken and the trial court should have complied. See *State v. DePaola*, 5 *N. J.* 1, 9 (1950).

## VIII.

■ Finally, we come to the defendant's contention that throughout the trial there was unfair or over-zealous advocacy by the State in violation of settled principles which recognize that the prosecuting attorney's primary function is not to convict but "to see that justice is done" (Canon 5) and that his duty is as much "to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States*, 295 *U. S.* 78, 88, 55 *S. Ct.* 629, 633, 79 *L. Ed.* 1314, 1321 (1935). See *State v. Bogen*, 13 *N. J.* 137, 139 (1953); *State v. Grillo*, 11 *N. J.* 173, 184 (1952), *certiorari* denied 345 *U. S.* 976, 73 *S. Ct.* 1123, 97 *L. Ed.* 1391 (1953); *State v. Ferrell*, 29 *N. J. Super.* 183, 187 (*App. Div.* 1954); *Viereck v. United States*, 318 *U. S.* 236, 247, 63 *S. Ct.* 561, 87 *L. Ed.* 734, 741 (1943); *People v. Levan*, 295 *N. Y.* 26, 64 *N. E.* 2d 341 (1945).

(a). During the State's examination of its witness De Lisle, the prosecuting attorney remarked that "anybody around here knew the game was going on," and during the examination of its witness Caporale he remarked, after the witness had testified that the defendant did not know the nature of his occupation, "everyone else knew it." *Cf. Berger v. United States, supra*:

"It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none."

(b). During the State's interrogation of its witness Walter Winne, it offered a letter addressed to Mr. Winne and dated June 26, 1944, which was during the incumbency in office of the defendant's predecessor; in support of its offer it made the unfounded assertion that the letter was designed "to show that as early as June 25, 1944 this defendant had notice of an illegal operation at this particular place."

(c). During the State's interrogation of its witness John E. Selser, it inquired whether the defendant "seemed to have plenty of money," and when objection was sustained the prosecuting attorney remarked that he would "save it for rebuttal"; significantly, he made no attempt to pursue the matter on rebuttal. *Cf.* 6 *Wigmore, supra*, § 1808, *p.* 276.

(d). The prosecuting attorney also ascertained from Mr. Selser that he had acted as counsel for certain well known gamblers or racketeers and inquired whether the county prosecutor knew of such representation when he appointed Mr. Selser in 1944 as first assistant prosecutor; it is difficult to imagine any proper basis for such line of questioning in this trial in which the State sought to establish the guilt of the defendant Orecchio alone. See *State v. Witte, supra*, 13 *N. J.*, at *page* 610.

(e). Similarly, no adequate basis has been suggested for the repeated and insinuating, though irrelevant, questioning by the State of its own witnesses as to whether they knew the notorious gambler Frank Costello. See *State v. Bartell,* 15 *N. J. Super.* 450, 458 (*App. Div.* 1951), affirmed 10 *N. J.* 9 (1951), where Judge Jayne noted that "depreciatory innuendoes and insinuations destitute of all probative substance may be very devastating to the protective rights of a defendant."

## IX.

In his recent discussion of Chicago crime and politics, the Director of the Chicago Crime Commission had occasion to repeat the observation that while "Ancient civilizations were destroyed by imported barbarians, we breed our own." *Peterson, Barbarians in our Midst*, 321 (1951). Unfortunately, our State also has its share of criminal conduct spawned by corrupt officials—it is a vicious thing and its very existence threatens the well being of our people. Enforcement authorities must be ever vigilant in seeking it out and bringing the offenders to trial. However, despite understandable impatience and occasional miscarriage, courts of

justice must act upon the belief that the truly guilty ones will be so found by juries after fair trials conducted in accordance with time tested legal principles; resort to other menacing courses which have become rampant elsewhere in the world will shatter the very foundations upon which our democratic society rests. We are satisfied that, under all of the circumstances evidenced by the record, the Appellate Division properly directed that the defendant be granted a new trial and its judgment is, accordingly,

Affirmed.

*For affirmance*—Justices OLIPHANT, WACHENFELD, BUR-LING, JACOBS and BRENNAN—5.

*For reversal*—Chief Justice VANDERBILT, and Justice HEHER—2.