**ROBINSON**

v.

**PENNSYLVANIA R. CO.**

No. 11175.

United States Court of Appeals
Third Circuit.

Argued Jan. 21, 1954.

Decided July 14, 1954.

Rehearing Denied Aug. 13, 1954.

Philip Price, Philadelphia, Pa. (F. Hastings Griffin, Jr., Barnes, Dechert, Price, Myers & Rhoads, Philadelphia, Pa., on the brief), for appellant.

B. Nathaniel Richter, Philadelphia, Pa. (Richter, Lord & Farage, Philadelphia, Pa., on the brief), for appellee.

Before McLAUGHLIN, KALODNER and STALEY, Circuit Judges.

STALEY, Circuit Judge.

This Federal Employers' Liability Act[1] case resulted in a verdict and judgment for plaintiff, and defendant appeals.

At the time of plaintiff's injury, he was the foreman in charge of a crew of defendant's employees who were engaged in resurfacing the Wyoming Avenue bridge in Philadelphia. That bridge carries vehicular and pedestrian traffic over the single-track, Oxford branch of the defendant railroad. Under circumstances which need not be detailed on this appeal, plaintiff was injured when he fell from the bridge to the ground below. At this point it is necessary to set out only those facts sufficient to the decision of defendant's objection to the district court's jurisdiction on the ground that, when injured and for some time before that, plaintiff's duties did not have sufficient intimacy with interstate commerce to justify his invocation of the Act.[2]

Plaintiff was regularly employed by defendant as a carpenter-foreman. That employment called for him to work, among other jobs, on bridges carrying interstate rail traffic or on vehicular bridges under which interstate rail traffic moved. The Wyoming Avenue bridge spanned defendant's single track, which carried interstate rail movements, but there is no evidence, nor can we judicially notice, that the vehicular traffic on the bridge was anything but intrastate. Plaintiff began working on this bridge on October 17, 1949, and remained on this job until his injury on December 5, 1949. On defendant's post-trial motion to set aside the judgment and enter judgment in its favor, the district court held that, in view of the widened scope of the Act since the 1939 amendment, plaintiff was covered because his regular work involved duties of both an interstate and intrastate nature and that seven weeks of work on an intrastate job was not so long a period of time as to make him exclusively an intrastate worker. D.C.E.D.Pa. 1953, 113 F.Supp. 863. The district court assumed without deciding that repairing an intrastate highway bridge over an interstate railroad track was not work of an interstate nature within the wording of the amended Act.

The Federal Employers' Liability Act provides that every interstate rail carrier " * * * shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce * * *."[3] That language was productive of no little confusion among railroaders as to whether they were engaged in interstate or intrastate commerce at the precise moment of injury.[4] Consequently, the 1939 amendment added the following paragraph:

"Any employee of a carrier, any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce; or shall, in any way directly or closely and substantially, affect such commerce as above set forth shall, for the purposes of this chapter, be considered as being employed by such carrier in such commerce and shall be considered as entitled to the benefits of this chapter."[5]

There is no doubt that the amendatory language broadened the coverage of the Act. It seems to have done so in two different ways. First, the phrase "any part of whose duties" clear-

1. 35 Stat. 65 (1908), as amended, 53 Stat. 1404 (1939), 45 U.S.C.A. § 51 et seq.

2. Both plaintiff and defendant are citizens of Pennsylvania.

3. 35 Stat. 65 (1908), as amended, 53 Stat. 1404 (1939), 45 U.S.C.A. § 51.

4. See annotation in 10 A.L.R.2d 1279, §§ 2 and 3 (1950).

5. Supra note 3.

ly eliminated the "moment of injury" test. The new phrase makes the general nature of the employee's duties the controlling factor. If "any part" of those duties furthers interstate commerce, the employee is covered, even though at the precise moment of injury the specific mechanical task in which he was engaged was purely intrastate. Second, the amendment extended coverage to one not immediately engaged in furthering interstate commerce if his duties in any way closely and substantially affected the furtherance of interstate commerce. The amendment itself is stated disjunctively, that is, it covers an employee if any part of his duties further interstate commerce, *or* if any part of his duties in any way directly, or closely and substantially affect such commerce. If that is the sense of the Act as presently worded, we think the plaintiff here is covered by both tests. Defendant concedes that the 1939 amendment broadened the Act's coverage but argues that, since the amendment is silent as to the period of time before the injury within which to examine the employee's duties to determine whether "any part" of them substantially affects interstate commerce, a reasonable time must be read into the Act and that seven weeks is not a reasonable time. On this score we agree with the district court's decision that plaintiff was covered. Plaintiff's regular work involved both inter- and intrastate duties. Consequently, some part of his duties were in furtherance of interstate commerce. Certainly, there will be cases where an employee is so long away from interstate commerce that it would be unreasonable to hold that he is within the Act, but we think this is not such a case. Furthermore, plaintiff is covered by the second area of extension of the Act. The track under the bridge that plaintiff was repairing carried interstate rail movements, and we think that such work is enough to " * * * in any way directly or closely and substantially, affect such commerce * * *." Walden v. Chicago & N. W. Ry., 1952, 411 Ill. 378, 104 N.E. 2d 240. Hallstein v. Pennsylvania R. R.,

6 Cir., 1929, 30 F.2d 594, much relied upon by defendant, has lost much of its vigor since the 1939 amendment. We conclude that plaintiff was covered by the Act and, therefore, that there was federal jurisdiction.

Of the many remaining matters urged upon us by both sides, the only one that stands out with any degree of clarity on this record is that, because of the bickering and brawling of both counsel, the jury could not possibly have decided the real issues on their merits but was sidetracked into passing judgment on the character of the attorneys.

We will set out some of the more flagrant statements contained in the arguments to the jury. The closing summation of plaintiff's counsel began like this:

"As usual, my good friend in these cases always attacks every lawyer, no matter who he is. The case is always a fake and it is always a · phony, and everybody is a liar, and everybody is pulling something to try to get something from the client he represents, everybody is a thief."

Then, taking a wholly unjustified view of defense counsel's comment upon plaintiff's complaint of pain in his back, plaintiff's counsel said, "Now, look who he has made a thief out of. He made a thief out of Dr. Goldsmith * * *. So Dr. Goldsmith is now a liar and he is putting something on to try to put something over on the railroad." At this point there was a defense objection, followed by some bickering, with no admonition from the court except to say " * * * the jury will be the judge of what was said. * * * let us go ahead." Plaintiff's counsel then returned to the same vein of argument, saying: "Now he comes around and makes a thief out of Dr. John Farrell * * * now Dr. Farrell is also a thief, and he is trying to put something over on the railroad." Referring to the defense comments on plaintiff's testimony, plaintiff's counsel said, "He [plaintiff] is seventy years old and he did not come in here to be made a thief of, and a liar, and a perjurer." These inflammatory accusations had no

factual foundation and had absolutely nothing to do with the real issues which the jury was to decide. Defense counsel had pointed to certain physical characteristics of the power saw, used to cut the planks on the bridge, as supporting his view of the way the work was being done when plaintiff was injured. Plaintiff's counsel replied: "Now let us get down to this little tricky stunt that he pulled here with this saw. * * * Don't you see what the whole stunt here is?" In his summation defense counsel said that the railroad was defending the case because it felt that the accident was plaintiff's own doing. Counsel for the plaintiff replied that the defense theory of the accident was " * * * to distort facts * * * in an effort to do what? * * * To fit this story of why the railroad defends this case. Why didn't he tell you why they are defending the thousands of others? Everybody is a thief, the railroad never lies. Is that nice?" One final statement by plaintiff's counsel deserves mention. He said near the end of his closing summation:

> "But the very idea to the whole argument, this whole plan, this whole idea, is to take this man and make a nonentity out of him, to destroy the existence of an Alfred Robinson of any kind upon their books or upon their records, to make it appear as if he were no one, as if he meant nothing to this company, as if the forty years of honest service had been nothing. How far up the echelons of this company do you have to go before they kick you out like a sawdust bag?"

Here a defense motion to withdraw a juror was denied.

■■■■ Enough has been set out to make it evident that the closing speech of counsel for the plaintiff dealt with many matters which were prejudicial because totally irrelevant and confusing to the jury. But, says plaintiff's counsel, defense counsel started the improper arguments and the former merely replied. To an extent that appears to be true, but

if so, " * * * then the trial had degenerated even more than we have indicated." United States v. American Die & Instrument Works, Inc., 3 Cir., 1954, 213 F.2d 731. If it is at all relevant to determine who started the improper arguments, it is worth noting that in the opening summation of plaintiff's counsel, in making light of the testimony and argument that the floor of the bridge was being sawed a whole section at one time, he said, "And that whole switch has been made for the purpose of trying to show contributory negligence on this man * * * there is not an iota of contributory negligence in this case, and any attempt to reduce this verdict that is being made on sheer imagination, somebody has been doing a little mixing here, twisting the dog around a little to try to keep this man from what the law says he should get under these circumstances * * *. They are trapped in this concoction of their own making." At any rate, recrimination has no place in counsel's jury speeches. New York Central R. R. v. Johnson, 1929, 279 U.S. 310, 49 S.Ct. 300, 73 L.Ed. 706; Chicago & N. W. Ry. v. Kelly, 8 Cir., 1936, 84 F.2d 569; Mittleman v. Bartikowsky, 1925, 283 Pa. 485, 129 A. 566. Especially is this so when dealing with conduct that shows not a mere isolated lapse from propriety in the heat of argument but repeated accusations against opposing counsel and client and repeated references to matters entirely foreign to the real issues before the jury. On the other hand, defense counsel's conduct was far from being a model of propriety. A few examples are in order. He began by saying that " * * * it is part of the act to come in and say: Well, of course, there is no question about the negligence here * * *." Later, in telling the jury not to confuse the evidence from the stand with what the lawyers said, especially what the plaintiff's lawyer said, defense counsel stated, " * * * because what he has told you about the way this cut was made was just as phony and just as inaccurate and just as unreliable [as another contention]. That contention

* * * was just a false statement, just as phony as the pretense * * *." He accused plaintiff's counsel of manufacturing his case, in the following language, "You are not expected to throw your commonsense and wits out of the window when you come into a courtroom and just accept some cock-and-bull story invented by the lawyer * * * that is a complete fabrication and invention on the part of the lawyer to try to get you bamboozled, to bring you around to some conclusion about this case that just is not so." Again, referring to the alleged direction of sawing the planks, he said, " * * * but for the purposes of this case Mr. Richter is willing to turn him around in the hope that that will turn you around too * * *." Finally, commenting on plaintiff's theory that his fellow workers were negligent in failing to warn him not to step on the sawed planks, which warning defendant contended was unnecessary because the danger was obvious, he said, "And yet that is the only way that the lawyer has been able to think up a story that might lead you to believe that Mr. Robinson ought to get any money in this." To none of these improper statements did plaintiff object. Indeed, plaintiff's attorney seemed more than happy to meet defendant's attorney on these grounds, and he showed that readiness to engage in personal abuse in his closing summation. The jury was empaneled, however, to pass upon entirely different issues, to be fought out on entirely different grounds. It is at least probable that the jury was utterly confused by these diversionary tactics, so that in the end their verdict might well represent their judgment of which lawyer was in the right as to the false issues, leaving the real issues undecided. See Kroger Grocery & Baking Co. v. Stewart, 8 Cir., 1947, 164 F.2d 841, 844. This conclusion is strengthened by the fact that none of the improper remarks evoked a reprimand from the trial judge or even a direction that they should be disregarded by the jury. Worse yet, in his charge the judge told the jury that "The lawyers in this case have argued the facts thoroughly and well * * *." This apparent approval of the accusatory statements of counsel might well have led the jury to believe that it could and should consider them in its deliberations. In short, we are firmly convinced that the conduct of both counsel was of such nature as to vitiate the entire trial. Both of these men are experienced and able lawyers, and there is no excuse for such conduct.

■ Plaintiff points out that only a few of the statements about which defendant complains were objected to at the time and that a motion to withdraw a juror was made to only one such statement. For lack of objection and specific motion, it is argued that an appellate court may not interfere. As to the ordinary case, we agree, but we have never understood it to be the law that flagrantly abusive statements, unsupported by the evidence and introducing matters clearly irrelevant to the jury's deliberation of the issues on the law and evidence, in the absence of an admonition to the jury, are immune from appellate redress simply because there was not an objection to each such statement. This field of improper trial arguments is not one where the citation of cases is of much help, but, to the extent that precedents are at all relevant, there is authority for the proposition that lack of an objection is not always a bar to correction and that, in the obvious case such as this, plain error may, indeed must, be noticed and rectified. New York Central R. R. v. Johnson, 1929, 279 U.S. 310, 318, 49 S.Ct. 300; Aetna Life Ins. Co. of Hartford, Conn. v. Kelley, 8 Cir., 1934, 70 F.2d 589, 594, 93 A.L.R. 471; Rouse v. Burnham, 10 Cir., 1931, 51 F.2d 709, 713. See also United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 239, 60 S.Ct. 811, 84 L.Ed. 1129.

■ As we are convinced that the jury did not have an opportunity fairly to pass upon the real issues because of the conduct of the attorneys, no purpose can be served in discussing the other matters raised on this appeal. Minneapolis, St.

P. & S. Ste. M. Ry. v. Moquin, 1931, 283 U.S. 520, 51 S.Ct. 501, 75 L.Ed. 1243.

The judgment of the district court will be reversed and the cause remanded for a new trial, each party to bear its own costs on this appeal.