88 So.2d 519 (1956)
SEABOARD AIR LINE RAILROAD COMPANY, APPELLANT,
v.
JOHN B. STRICKLAND, APPELLEE.
Supreme Court of Florida, Special Division B.
May 23, 1956.
Rehearing Denied July 19, 1956.
Fleming, Scott & Botts, Charles R. Scott, Jacksonville, and James B. McDonough, Jr., Norfolk, Va., for appellant.
Nichols, Gaither, Green, Frates & Beckham and William Frates, Miami, for appellee.
PARKS, Associate Justice.
In the original appeal the defendant-appellant, Seaboard Air Line Railroad Company, presented two questions, the first dealing with negligence vel non, and the second *520 dealing with the admissibility and discussion by counsel of certain evidence. This court reversed the judgment, deciding that the defendant was not guilty of negligence and as to the second question said "because of the view which we entertain as to this question [negligence vel non], it is unnecessary to refer to or answer the other question propounded by the defendant." See Seaboard Air Line Railroad Company v. Strickland, Fla., 80 So.2d 914, 915.
On review by the United States Supreme Court that court reversed our judgment by its order of November 14, 1955 in the following language:
"Per Curiam: The petition for writ of certiorari is granted and the judgment is reversed. Bailey v. Central Vermont Ry., 319 U.S. 350 [63 S.Ct. 1062, 87 L.Ed. 1444]."
Thereafter, the defendant petitioned this court to consider its second question prior to the issuance of our mandate, because that question had been excluded from our consideration in our former opinion and judgment. The original appeal contained two questions, and pursuant to the mandate of the Supreme Court of the United States, the first question is controlled by the pronouncement of that Court in Bailey v. Central Vermont Ry., 319 U.S. 350, 63 S.Ct. 1062, 87 L.Ed. 1444. The mandate from the Supreme Court of the United States ordered "that this cause be, and the same is hereby, remanded to the Supreme Court of Florida for proceedings not inconsistent with the opinion of this Court." (Italics supplied.) Since the second question was not determined by this court and, therefore, not reviewed by the Supreme Court of the United States, we do not deem it to be contrary to the order of that Court to review the second question at this time, and particularly since the defendant has not yet had its day in a reviewing court on the points of law posed in the second question.
Involved in defendant Railroad's second question in its brief are the factors of whether or not the letters of the "Brittingham correspondence" were admissible in evidence over the objections of defendant and further, even though admissible, whether or not the remarks of counsel concerning these letters and other matters in his presentment and argument of the case to the jury were so prejudicial as to require a reversal of the judgment and the granting of a new trial.
The Brittingham correspondence consists of three letters, one written May 19, 1953, by defendant's senior general attorney of its claim department, Smith R. Brittingham, Norfolk, Virginia, to Dr. Thomas Ryon, medical practitioner with offices in Miami who was under contract with the defendant Railroad to examine and treat employees for injuries received in the course of their employment with the company; attached to this letter was one dated May 1st written by B.H. Silverstone of the Veterans Administration of Coral Gables, addressed to J.E. Pierce, Grand Lodge Chairman of the Brotherhood of Railroad Carmen of America (this letter had been delivered to the senior counsel by Pierce); the reply letter of Dr. Ryon of May 22nd. Omitting the headings and signatures, these letters read as follows:
"Dear Dr. Ryon:
"I have previously written you with reference to the case of Mr. John B. Strickland, who has been rather persistently and methodically chopping around among the doctors for treatment.
"During the latter part of April Mr. Strickland apparently conceived the idea that if he were to apply to the Veterans Administration Hospital at Coral Gables, he would unquestionably be able to get a scientifically accurate diagnosis. Mr. Strickland entered the hospital and was examined there on April 20th, last, following which a report was made to Mr. J.E. Pierce, Grand Lodge Chairman of the Brotherhood of Railway Carmen of America, under date of May 1st. Mr. Pierce who always collaborates with *521 both the Claim and Medical Departments of the Seaboard, at once brought the original of the letter to us for such value as it might have in further handling of Mr. Strickland's case. I therefore, take pleasure, and assure you I am deriving no small degree of amusement, in enclosing herewith copy of the aforesaid letter of May 1st to Grand Lodge Chairman Pierce. I confess that when Dr. Collins and I saw the diagnosis we enjoyed a spell of laughter as hearty and as extensive as any in recent years. I am sure you will also experience appreciable amusement upon noting the dire condition which the examiners at the Veterans Administration Hospital discovered."
"Dear Mr. Pierce:
"Please be advised that Mr. John B. Strickland was examined at this hospital 4-20-53.
"Diagnosis: Local Myofascitis, Chronic.
"Recommendation: Heat, diathermy,
 novocain iontophoresis.
 Hospitalization not necessary for
 this."
"Dear Mr. Brittingham:
"Thank you for your letter of May 19th and your enclosure from the Veterans Administration regarding John B. Strickland. I did indeed join you in your sentiments.
"I hope that the next time you are in Miami you will be able to drop around at the Clinic here to see Dr. Fischer and myself."
Counsel for plaintiff-appellee in the trial court contended that this correspondence was admissible on the ground that "it showed the way this man (plaintiff) was kicked around by the Seaboard and the conduct of the Seaboard Air Line in handling this matter". In his argument and brief in this court he shifts to the ground that the letters were admissible to repudiate Dr. Ryon's claim that plaintiff's trouble was in his mind rather than in his back, also that they furnished good cause for plaintiff (who had no knowledge of the letters until the trial) to distrust Dr. Ryon and the Railroad Company and think that they were not rightly trying to help him. Dr. Ryon, in January 1953, examined plaintiff's condition with reference to injuries suffered and for which this suit is brought. To support these grounds he argues that Railroad counsel, Dr. Ryon and Pierce, the Union official, all conspired together to defeat plaintiff's claim and at the trial tried to prove that plaintiff was a psychological neurotic because he trusted neither the Railroad nor Dr. Ryon. Neither of these contentions are supported by the letters or by the evidence in the record. There is no evidence that defendant had any connection with the writing of the Veterans Administration letter or its subject matter. Nor is there any evidence in the record of conspiracy by anyone connected with defendant to hinder or defeat plaintiff's claim or suit against it. The inter-departmental letters of Brittingham and Dr. Ryon contained no evidence tending to prove or disprove plaintiff's case or any phase of it, nor did they aid or rebut the defense. It must be also noted that plaintiff made Dr. Ryon his witness. There was no foundation in the evidence for admitting the letters and it was error to admit them over objection of defendant. They were, however, obviously prejudicial to the defense of the cause and furnished a basis for numerous prejudicial remarks of plaintiff's counsel in the trial of the case. Among such remarks, on re-direct examination of Dr. Jarrett, plaintiff's witness, the following appears:
"Now, Doctor, if a man had worked for a railroad, and worked for them for a series of years, then got injured, and then say they pushed him around  sent him from one doctor to another doctor or to another doctor  and told him it was all in his mind, where it seemed to be a joke; now would that be a situation where a man would resent that kind of treatment, *522 wouldn't it? That would be the normal thing, wouldn't it?"
"Doctor, if an orthopedic specialist had made a diagnosis of chronic myofascitis  I don't know if I pronounced it correctly  would you consider that a joking matter for a man who was engaged in railroad work?"
"Would that, to you as a doctor, throw you into fits of laughter and be a joke?"
"All right, sir. But it is a disabling diagnosis, or a disabling factor, isn't it  `local myofascitis, chronic, recommend heat, novocain; hospitalization not necessary for this'  that wouldn't throw you into fits of laughter, as a physician, would it, sir?"
Among the damaging remarks in his opening argument to the jury at the close of trial, referring to the Brittingham correspondence, counsel stated:
"I tell you, gentlemen, when I asked Dr. Jarrett, he said `I don't think it is funny'. I brought this out, and the Judge permitted me to introduce it in evidence, because the doctor said he had an antagonistic attitude toward the employer.
"I don't know whether Strickland is normal, but I think I am, and I am telling you I would have an antagonistic attitude toward people who would write stuff like these people have written.
"Now, gentlemen, I want you to take this letter with you, please, when you go into the jury room.
"The chief surgeon and the senior general attorney  I can see them sitting in their office laughing. They think it is funny.
"* * * I can just see them up there with their feet on their desk, `Isn't this a big joke? Strickland has hurt his back, and he is having trouble with it.'
"Well, I don't think it is a joke, and there is one thing, gentlemen, Strickland doesn't think it is a joke, and I don't think his wife thinks it is a joke * * * If you think, under the evidence, we are entitled to a verdict, I would like to wipe that smile off Brittingham's face. * * *
"I don't suppose he has ever worked with his hands, or his back; and I don't suppose he will have to work with his hands and his back. * * * When people get so careless they can sit up in a plush office in Norfolk, Virginia, and laugh about a man 30 years old who has a permanent back injury, then things are coming to a sad state of affairs."
Giving his version of the accident in which plaintiff was injured and while speaking of a demonstration of it staged during the trial at the place of its happening in the yards of the defendant Railroad, counsel in his argument to the jury in effect gave the following testimony:
"Now, frankly, the demonstration out there made, as far as I am concerned, the question of their liability, easy. I would like to discuss a reasonably safe place to work just briefly. Now, it doesn't mean completely putting it over the pit; it means providing them a reasonably safe place to work  a place free from grease, free from rock, and free from places where a man might hurt himself.
"That demonstration out there today, on our motion  and I think that you gentlemen out there and seeing the actual facts, can put the witnesses in this case in their proper place.
"Now, gentlemen, it was a strange thing that happened out there today, and to my way of thinking it is typical of Seaboard Airlines' attitude in this entire case. When you came out there these bolts and hangars were loose. That is why you had to wait. I went out there and saw it, and I called Mr. Langford over and said, `You put those back up there,' and they did.

*523 "Do you know why those were loose and taken off? I will tell you why. They didn't want you to see those two men get under that car on those rocks and in that grease. * * *
"Was there any doubt in any of your minds that that was a reasonably safe place to work when those two men had to get in there and undo those bolts on their back on those rocks and in that grease?
"Now, every one of these Seaboard men have said it is necessary to have good footing. Look at these rocks. You saw that grease out there. Sometimes that grease is slippery, and sometimes it isn't. Did you see all of that grease around there? Is that good footing?
"You fellows saw that fellow out there taking that beam off. I wrote down, and I am sure you saw it, he knocked his hat off on this same journal box; and several times he brushed his back very, very close to it, and one time he hit it. I am not sure, but it was within inches. Did you see him that time he was moving that thing around on the tracks, trying to pull it out, and he was grunting and groaning; * * *
"I am confident that after you have heard this evidence, and after you have seen that demonstration out there, that there is no question in your mind  and certainly there is none in mine  about the failure of this railroad to use ordinary care.
"I don't think railroads are bad. I think the railroads have done a lot to help this country; but I think in this case the Seaboard Airline has pulled every sly trick in the books."
There are other remarks of the same character in the record, some of little consequence and others trivial, all of which must be considered as a part of the course of conduct indulged in the handling of the trial. None was in recrimination of conduct of defense counsel. To many of counsel's prejudicial remarks, occurring during the taking of the testimony, objections were made. In a few instances some of the objections were sustained and in one or two instances a mild rebuke to counsel was administered. To some of the remarks during the trial no objections were made nor were objections made to counsel's argument before the jury.
While we are committed to the rule that in the ordinary case, unless timely objections to counsel's prejudicial remarks are made, this court will not reverse the judgment on appeal, however, this ruling does not mean that if prejudicial conduct of that character in its collective impact of numerous incidents, as in this case, is so extensive that its influence pervades the trial, gravely impairing a calm and dispassionate consideration of the evidence and the merits by the jury, this court will not afford redress. In this state of the record, even though the Brittingham correspondence was admissible, the prejudicial remarks of counsel, including the statements made in argument amounting to testimony in the case, require a new trial. Courts are conscious of the fact that without partisan zeal for the cause of his client, counsel in many instances could have little success in properly representing litigants in sharply contested cases, but his conduct during the cause must always be so guarded that it will not impair or thwart the orderly processes of a fair consideration and determination of the cause by the jury.
Finally, plaintiff's counsel complains that defendant's counsel in their brief make a personal attack on him, listing twenty-one items appearing in the brief. An examination of this brief fails to sustain any personal or professional attack on him or his firm.
The principles above mentioned are supported by precedent. Seaboard Air Line Ry. v. Smith, 53 Fla. 375, 43 So. 235; Tampa Transit Lines, Inc., v. Corbin, Fla., 62 So.2d 10. In both cases, conduct of counsel, much less offensive than in this case, was condemned by this court. Objections are not required where the conduct complained *524 of runs through the trial. New York Central R. Co. v. Johnson, 279 U.S. 310, 49 S.Ct. 300, 303, 73 L.Ed. 706, wherein Justice Stone speaking for the court said:
"Respondents urge that the objections were not sufficiently specific to justify a reversal. But a trial in court is never, as respondents in their brief argue this one was, `purely a private controversy * * * of no importance to the public.' The state, whose interest it is the duty of court and counsel alike to uphold, is concerned that every litigation be fairly and impartially conducted and that verdicts of juries be rendered only on the issues made by the pleadings and the evidence. The public interest requires that the court of its own motion, as is its power and duty, protect suitors in their right to a verdict, uninfluenced by the appeals of counsel to passion or prejudice. * * * Where such paramount considerations are involved, the failure of counsel to particularize an exception will not preclude this court from correcting the error."
To the same effect is Robinson v. Pennsylvania R. Co., 214 F.2d 798, 802, Third Circuit Court of Appeals:
"Plaintiff points out that only a few of the statements about which defendant complains were objected to at the time and that a motion to withdraw a juror was made to only one such statement. For lack of objection and specific motion, it is argued that an appellate court may not interfere. As to the ordinary case, we agree, but we have never understood it to be the law that flagrantly abusive statements, unsupported by the evidence and introducing matters clearly irrelevant to the jury's deliberation of the issues on the law and evidence, in the absence of an admonition to the jury, are immune from appellate redress simply because there was not an objection to each such statement. This field of improper trial arguments is not one where the citation of cases is of much help, but, to the extent that precedents are at all relevant, there is authority for the proposition that lack of an objection is not always a bar to correction and that, in the obvious case such as this, plain error may, indeed must, be noticed and rectified."
To the same effect is the holding in United States v. American Die & Instrument Works, Inc., 3 Cir., 213 F.2d 731.
It is the responsibility of the trial court to protect litigants against such interference by counsel with the orderly administration of justice and the protection of the right of the litigant to a verdict "uninfluenced by the appeals of counsel to passion or prejudice."
The judgment is reversed and a new trial granted.
It is so ordered.
DREW, C.J., and TERRELL and ROBERTS, JJ., concur.