668 So.2d 1016 (1996)
James A. NORMAN, Jr. and Tyleia Norman, Appellants,
v.
GLORIA FARMS, INC., Appellee.
No. 93-2181.
District Court of Appeal of Florida, Fourth District.
February 7, 1996.
Order on Denial of Hearing February 7, 1996.
Certification and Conflict of Question Denied April 9, 1996.
*1018 Russell S. Bohn of Caruso, Burlington, Bohn & Compiani, P.A., West Palm Beach, and Orrin Beilly of The Law Offices of Orrin R. Beilly, West Palm Beach, for appellants.
Stephen G. Hayskar and Garrison M. Dundas of Brennan, Hayskar, Jefferson, Gorman, Walker & Schwerer, P.A., Fort Pierce, for appellee.
Order on Denial of Hearing En Banc February 7, 1996.
PARIENTE, Judge.
Plaintiffs, James and Tyleia Norman, appeal an adverse jury verdict in a personal injury lawsuit. We reverse because the combination of improper contact between the jury's foreman and his brother, an employee of defendant's liability carrier, and repeated improper remarks in closing argument lead us to conclude that plaintiffs did not receive a fair trial from an impartial jury.
Plaintiff, James Norman, received injuries while hog hunting on the premises of defendant, Gloria Farms, located in Okeechobee County, Florida. Plaintiff Norman, along with a group of five others, had been invited to go hunting for wild hogs by a ranch hand who had received permission from his father, the farm's foreman. Plaintiffs filed suit for damages, alleging that the accident was caused by the presence of a culvert covered with vegetation on the side of a road where plaintiff Norman had been riding in the morning hours of January 7, 1990. Liability was contested. A central issue regarding defendant's liability was whether it negligently maintained its premises in a dangerous condition and negligently failed to warn of the dangerous condition created by the camouflaged culvert. Following trial, the jury rendered a verdict in favor of defendant.

THE JUROR ISSUE
After the adverse jury verdict, plaintiffs learned that the foreman of the jury was the younger brother of an agent of Florida Farm Bureau, defendant's liability insurer.[1] The brother, in fact, had participated in the liability investigation of plaintiff Norman's accident. Defendant does not dispute this fact. The trial court granted a jury interview based on verified allegations of improprieties. *1019 Instead of a jury interview before the court, the court authorized the taking of the deposition of the juror where both sides, but not the court, were present. The juror testified that while he knew his brother worked for the insurance company, he did not know that his brother's company insured defendant or that his brother had taken part in the investigation of the accident.
Plaintiffs further learned in post-trial deposition that the juror had two conversations with his brother during this three-day trial regarding the case. Although the juror testified in deposition that no substantive matters concerning the case were discussed during either conversation with his brother, he did admit that he told his brother, in response to his brother's inquiry as to how the case was going, that "Mr. Hayskar [defense counsel] was eating [plaintiffs' trial counsel's] lunch."[2]
At the outset of trial, the judge expressly and repeatedly instructed the jury that they were prohibited from discussing the case with third parties in order to prevent outside influence, and further instructed them not to prematurely form an opinion as to the merits of the case or receive any evidence outside of the courtroom. Despite the judge's explicit instruction, the offending juror admittedly engaged in two separate conversations with his brother regarding the case during the three-day trial. His brother was not just a relative, but an employee of the defendant's liability carrier who participated in the investigation of this particular accident.
The very fact that questions were asked of a juror by a representative of defendant's liability carrier during the pendency of the trial and the fact that the juror discussed the case in any manner with an outside party is troubling. It is axiomatic that one side ought not to have an unfair advantage by learning from a juror prior to the jury verdict how the case was going. Such information has the potential of influencing any settlement discussions during trial and trial strategy.
The fact that a juror is approached by a party, his agent or attorneys, or even the trial judge is considered an objective act extrinsic to the verdict which potentially compromises the integrity of the fact-finding process. See Maler v. Baptist Hosp. of Miami, Inc., 559 So.2d 1157 (Fla. 3d DCA 1990), order approved, 579 So.2d 97 (Fla.1991); Fitzell v. Rama Indus., 416 So.2d 1246, 1247 (Fla. 4th DCA 1982). As stated by the third district in Maler:
In order to constitute juror misconduct and, therefore, a matter extrinsic to the verdict sufficient to set aside the verdict or for a post-trial jury inquiry, Florida and other courts have consistently held that some objective act must have been committed by or in the presence of the jury or a juror which compromised the integrity of the fact-finding process, as where ... a juror was approached by a party, his agent or attorneys....
559 So.2d at 1162.
We find that the agent's improper contact with a juror and their subsequent conversation regarding the juror's perceptions of the case constitute objective acts within the contemplation of Maler that compromise the integrity of the fact-finding process. The question of "how the case was going" was initiated by a representative of defendant. This represents an instance of improper contact which will not be tolerated as a matter of public policy. Additionally, the response made by the juror was in contravention of an express instruction by the trial court not to discuss the case with anyone. That his response plainly indicated the juror's perceptions regarding the merits of the case further exacerbated the negative impact of the juror's misconduct.
In Amazon v. State, 487 So.2d 8, 11 (Fla.), cert. denied, 479 U.S. 914, 107 S.Ct. 314, 93 L.Ed.2d 288 (1986), the supreme *1020 court enunciated the general rule that "potentially harmful misconduct is presumptively prejudicial." Contact with a juror during trial about the pending matter falls within this category. Id. Once that threshold has been met, the burden then shifts to the party seeking to preserve the jury's verdict to demonstrate that the contact was harmless. Id. In Maler, 579 So.2d at 100 n. 1, and State v. Hamilton, 574 So.2d 124, 129 (Fla. 1991), the supreme court made this standard even more explicit. Once improper contact or juror misconduct is established by juror interview, the moving party is entitled to a new trial unless the opposing party can demonstrate that there is no reasonable possibility that the juror misconduct affected the verdict. See also Amazon, 487 So.2d at 11.
We believe the record demonstrates that a potentially prejudicial communication occurred and defendant did not dispel the presumption of prejudice. The communication in this case at the very least supplied an employee of defendant's liability carrier with information that could improperly give defendant an unfair advantage. This cannot be countenanced as a matter of policy.
Albeit in a different context, that of an ex parte communication between a trial judge and a deliberating jury, specific prejudice will also be presumed even if the communication is innocent and purportedly unrelated to the issues in the case. See, e.g., Hernandez v. Charles E. Virgin, M.D., P.A., 505 So.2d 1369 (Fla. 3d DCA 1987). In those cases it has been held that:
[R]eversal is required where ... owing to the nature of the ex parte communication, the reviewing court is unable to determine whether the action was actually harmless. Hatin v. Mitjans, 578 So.2d 289, 290 (Fla. 3d DCA), review denied, 591 So.2d 181 (Fla. 1991).[3]
A new trial based on complained-of conduct or improper contact may be required under "some circumstances as a matter of public policy for the purpose of maintaining confidence in the integrity of jury trials." Policari v. Cerbasi 625 So.2d 998, 998 (Fla. 5th DCA 1993) (citing Snelling v. Florida E. Coast Ry., 236 So.2d 465, 466 (Fla. 1st DCA 1970)). While a party is not necessarily entitled to a perfect trial, a party is entitled to a fair one. Id. The combination of the juror's relationship to and conversations with his brother together with improper and inflammatory remarks made by defense counsel during closing argument substantially undermined plaintiffs' right to a fair trial, compromised the integrity of this jury trial, and thwarted substantial justice. Doyle v. State, 460 So.2d 353, 356-57 (Fla. 1984); Policari; see generally Ford v. Robinson, 403 So.2d 1379 (Fla. 4th DCA 1981). We therefore address the improper comments of defense counsel in closing argument.

IMPROPER CLOSING ARGUMENT REMARKS
Okeechobee is a rural community with many ranches and farms. Hunting (including wild hog hunting) is a popular sport as evidenced by the fact that among the six jurors and one alternate seated, only two had never hunted. Among the other five, four hunted, including hunting for hogs, and the fifth juror's husband hunted often.
During closing, defense counsel made the following arguments, all of which we find to be an improper appeal to the *1021 passions and prejudices of this jury on the critical issues of liability and financial responsibility. Near the beginning of his closing argument, defense counsel stated:
A verdict in this case for the Normans, a verdict in this case against Gloria Farms is going to bring an immediate halt to hog hunting in Okeechobee.
Can you imagine any rancher, anybody that owns property in this town or community ever allowing anybody to come out and hog hunt again? Not if the news of this were to get out?
Midway through his argument, defense counsel returned to this line of improper argument:
This is just a decision you need to make based on being an Okeechobee resident and knowing there is lots of ranch property around and hog hunting is something special in Okeechobee, it is not done everywhere, and trying to decide in your own mind what should be reasonably expected of a ranch owner who is willing to allow a group of people to come out and hunt hogs on his property. What should be expected in those circumstances and those conditions.
Finally, the closing argument concluded with the following exhortation:
Take your time; there is no rush. Talk it out among yourselves. Do what is right. Do what justice requires. And your message will be heard by every landowner in Okeechobee County.
The message that defendant was communicating to the jury of Okeechobee residents was clearto render any verdict in this case for plaintiffs would endanger the recreational usage of all land in Okeechobee County for hunting. Although no punitive damages were being claimed, defense counsel impermissibly claimed that the verdict would have a punitive effect on landowners in general. He directly implored the jury to protect their neighbors, as well as their own interests as hunters and community residents, by returning a verdict for defendant, warning that a verdict in favor of plaintiffs would bring "an immediate halt to hog hunting in Okeechobee." This statement is not only totally unsupported by the evidence; it is blatantly untrue.
Defense counsel's remarks during his closing impermissibly went far beyond traditionally impermissible golden rule arguments with a totally improper appeal to the jurors' self-interest as hunters, fellow Okeechobee residents and "the conscience of the community." Whereas a golden rule argument may ask the juror to put himself or herself in the shoes of the litigant, here defense counsel told the jurors that they would in fact be personally affected by the outcome of this case. With his persuasive plea to the jurors as residents of the Okeechobee community, defense counsel launched a "conscience of the community" attack by asking the jurors to consider the effect of a plaintiffs' verdict on their lives in Okeechobee. Similar appeals to the prejudices of the jury have been condemned. S.H. Inv. & Dev. Corp. v. Kincaid, 495 So.2d 768 (Fla. 5th DCA 1986), review denied, 504 So.2d 767 (Fla.1987). As the fifth district stated in Kincaid:
This us-against-them plea can have no appeal other than to prejudice.... Such argument is an improper distraction from the jury's sworn duty to reach a fair, honest and just verdict according to the facts and evidence presented at trial.... Our condemnation of a "community conscience" argument is not limited to the use of those specific words; it extends to all impassioned and prejudicial pleas intended to evoke a sense of community law through common duty and expectation.
Id. at 771 (quoting Westbrook v. General Tire & Rubber Co., 754 F.2d 1233, 1238-39 (5th Cir.1985)). See generally Borden, Inc. v. Young, 479 So.2d 850 (Fla. 3d DCA 1985), review denied, 488 So.2d 832 (Fla.1986).
By telling the jurors that their verdict would put an end to recreational hog hunting, and by asking the jurors to decide this case as Okeechobee residents knowing that hog hunting is "something special in Okeechobee," defense counsel attempted to dissuade the jurors from deciding the case in a fair and impartial manner based on the evidence and issues in this case. Instead, the jurors were told that the outcome of this case would affect them personally and their way of life in *1022 Okeechobee. The comments thus constituted a threat on two levels: that a verdict would destroy the jurors' lifestyle and that a verdict would subject the jurors to community condemnation.
Besides invoking fears personal to the jurors as Okeechobee residents, defense counsel also played on general fears and prejudices of the jury by evoking images of runaway verdicts and frivolous lawsuits and their effect on the American system of justice[4] and by attacking plaintiffs' lawyers with impermissible comments regarding their trial strategy in personal injury cases.[5] All of these arguments have been uniformly condemned. Plaintiffs describe defense counsel's closing argument as a veritable catalogue of improper closing arguments and we agree.
The frequency with which improper and inflammatory references to matters outside the record are made by trial lawyers during closing argument prompted Judge Alvarez to refer to the problem as a "malady" which has "with increasing and disturbing frequency, infected the courtrooms of this state." Bosch v. Hajjar, 639 So.2d 1096, 1097 (Fla. 4th DCA 1994) (Alvarez, Assoc. J., concurring). Judge Klein expressed his exasperation that, no matter how often appellate opinions address the subject, "trial counsel and trial judges do not seem to get the message" that inflammatory arguments made by counsel for either plaintiff or defendant will not be tolerated. Bellsouth Human Resources Admin., Inc. v. Colatarci, 641 So.2d 427, 430 (Fla. 4th DCA 1994).
Apparently, this problem is not simply a malady of the nineties. In 1978, Judge Letts expressed that "[w]e are distressed at an increasing tendency, by the trial bar, to permit the noble art of trial practice to degenerate into a free-for-all." Nelson v. Reliance Ins. Co., 368 So.2d 361, 361 (Fla. 4th DCA 1978). Too often we see examples of both sides engaging in improper argument in a kind of "tit for tat" approach to trial advocacy.[6]See, e.g., Bellsouth; Borden; Metropolitan Dade County v. Dillon, 305 So.2d 36 (Fla. 3d DCA 1974), cert. denied, 317 So.2d 442 (Fla.1975).
However, here plaintiffs' counsel did not engage in misconduct during closing argument and, in fact, did nothing to prompt the improper comments, so that defendant's arguments cannot, by any stretch of the imagination, be deemed a fair response to the opposing side's tactics. See Borden. The difficulty presented by this case is not plaintiff's *1023 similar misconduct; but rather, the failure of plaintiffs' counsel to object during the entire litany of improper closing argument remarks.
While not condoning improper closing arguments, our court has been unwilling to overturn a verdict in the absence of a contemporaneous objection unless the remarks are so outrageous that they rise to the level of fundamental error.[7] The remarks must be "of such character that neither rebuke nor retraction may entirely destroy their sinister influence." Baggett v. Davis, 124 Fla. 701, 717, 169 So. 372, 379 (1936); Budget Rent A Car Sys. v. Jana, 600 So.2d 466 (Fla. 4th DCA), review denied, 606 So.2d 1165 (Fla.1992); LeRetilley v. Harris, 354 So.2d 1213, 1215 (Fla. 4th DCA), cert. denied, 359 So.2d 1216 (Fla.1978). See also Tyus v. Apalachicola N. R.R., 130 So.2d 580, 587 (Fla.1961); Seaboard Air Line R.R. v. Strickland, 88 So.2d 519 (Fla.1956). We find significant our supreme court's holding in Strickland which dealt with unobjected-to closing argument in a civil case:
While we are committed to the rule that in the ordinary case, unless timely objections to counsel's prejudicial remarks are made, this court will not reverse the judgment on appeal, however, this ruling does not mean that if prejudicial conduct of that character in its collective impact of numerous incidents, as in this case, is so extensive that its influence pervades the trial, gravely impairing a calm and dispassionate consideration of the evidence and the merits by the jury, this court will not afford redress.... Courts are conscious of the fact that without partisan zeal for the cause of his client, counsel in many instances could have little success in properly representing litigants in sharply contested cases, but his conduct during the cause must always be so guarded that it will not impair or thwart the orderly processes of a fair consideration and determination of the cause by the jury.
88 So.2d at 523. Our supreme court further elaborated on the appellate court's ability to reverse based on closing argument remarks in certain limited circumstances:
For lack of objection and specific motion, it is argued that an appellate court may not interfere. As to the ordinary case, we agree, but we have never understood it to be the law that flagrantly abusive statements, unsupported by the evidence and introducing matters clearly irrelevant to the jury's deliberation of the issues on the law and the evidence, in the absence of an admonition to the jury, are immune from appellate redress simply because there was not an objection to each such statement.
Id. at 524 (quoting Robinson v. Pennsylvania R. Co., 214 F.2d 798, 802 (3d Cir.1954)).
We continue to adhere to the proposition adopted by this court that we "perceive very few instances where remarks by an attorney are of such sinister influence as to constitute reversible error, absent objection." Nelson, 368 So.2d at 361. See also LeRetilley. However, the remarks here went far beyond traditional golden rule arguments which we have found do not constitute *1024 fundamental error warranting reversal absent objection. See Jana; LeRetilley. Moreover, we find the nature of defense counsel's arguments to be far more egregious in their potential impact on the integrity of the fact-finding process than other types of arguments which have been condemned based solely on constituting a violation of Florida Rule of Professional Conduct 4-3.4(e).[8] In this case, the impermissible statements were inflammatory, directly appealing to the juror's passions and prejudices and calculated to produce a verdict based on fear and self-interest. See Baggett, 124 Fla. at 717, 169 So. at 379. The statements were "flagrantly abusive" and "unsupported by the evidence." See Strickland, 88 So.2d at 524. Accordingly, due to the nature of the remarks, their collective import and their pervasiveness throughout closing argument, we find that the remarks constitute fundamental error. See Strickland.
Based on the combination of the juror issue and defense counsel's improper and inflammatory closing argument, we reverse and remand for a new trial.
GLICKSTEIN, J., and KROLL, KATHLEEN, Associate Judge, concur.

ON REQUEST TO EN BANC
A member of the court in active service having requested a poll of the judges in active service for hearing en banc in accordance with Rule 11.1 of this court's Manual of Operating Procedures, it is hereby ordered that the request for hearing en banc is denied.
GLICKSTEIN, WARNER, POLEN, PARIENTE and GROSS, JJ., concur.
STONE, J., concurs specially with opinion in which DELL, J., concurs.
FARMER, J., dissents with opinion in which GUNTHER, C.J., concurs.
STEVENSON, J., dissents with opinion in which SHAHOOD, J., concurs.
KLEIN, J., did not participate.
STONE, Judge, concurring.
I write in protest of our publishing the dissenting opinion of Judge Farmer, or that of any other judge who is not a duly designated member of the panel deciding the merits of this case, even though that dissenting opinion is in dissent of a decision by the court not to consider the matter en banc. It seems to me that our doing so turns the appellate scheme, as outlined in our constitution and court rules, on end, notwithstanding that such a practice may be followed in federal circuits.
I cannot resist adding, although I likewise ought not be permitted to do so, that I disagree with Judge Farmer's criticism on the merits of the panel opinion. I would go even further than the panel, in recognizing our responsibility to address significant misconduct by counsel in the course of litigation, and follow the practice of the Third District, as expressed in Borden v. Young, 479 So.2d 850 (Fla. 3d DCA 1985), rev. denied, 488 So.2d 832 (Fla.1986). Judge Farmer quotes, in disagreement, a portion of that opinion, at the end of his dissent; I would add, with approval, the balance of what that court said. After addressing the comments of offending counsel under established standards, the court, in Borden, added:
Perhaps more important is the broader jurisprudential issue which is raised by cases like this. In our view, it is no longer if it ever wasacceptable for the judiciary to act simply as a fight promoter, who supplies an arena in which parties may fight it out on unseemly terms of their own choosing, and then, on the ground that the loser has asked for what he received, obediently raise the hand of the one who emerges victorious. We demean ourselves and the system of justice we serve when we permit this to occur. In Schreier v. Parker, 415 So.2d 794, 795 (Fla. 3d DCA 1982), we gave notice that "[a]rguments in *1025 derogation of Fla.Bar Code Prof.Resp. EC 7-24, DR 7-106(C)(3), (4) will not be condoned in this court, nor should they be condoned by the trial court, even absent objection. Hillson v. Deeson, 383 So.2d 732 (Fla. 3d DCA 1980)." We hereby make that promise good and inform the plaintiffsas we likely would have the defendant if it had wonand those in all future such cases that we will not supinely ratify the result of a trial like the present one. The judgment below is reversed for a new and, it is to be hoped, acceptable trial.
Id. at 851-52 (footnotes omitted).
Regardless of whether we agree with the panel decision here to sanction counsel's final argument in this case, which in my view went well beyond a golden rule argument and might be construed as an effort to intimidate the jury, the panel should be commended, not chastised, for its acceptance of that responsibility.
FARMER, Judge, dissenting.
I dissent from the court's refusal to grant en banc review of this case. Ordinarily, I would accept the vote of the majority to deny en banc review without comment, even where I personally voted for it. But the panel's decision in this case is such a sharp departure from this court's precedents on unobjected argument in civil cases that I believe it necessary to state in writing the extent of the implications of today's decision. My comments are an appeal to future judgesto the hope that some day we will correct today's change.
In my opinion, the panel's resolution of the closing argument issue conflicts with this court's prior decisions in LeRetilley v. Harris, 354 So.2d 1213 (Fla. 4th DCA), cert. denied, 359 So.2d 1216 (Fla.1978); and Nelson v. Reliance Ins. Co., 368 So.2d 361 (Fla. 4th DCA 1978). The panel views the particular golden rule argument in this casei.e., "a plaintiff's verdict will end hog hunting in Okeechobee county [paraphrased]"as even more vile than an ordinary golden rule argument. Their opinion thus holds that some golden rule arguments in civil cases may be deemed fundamental error, in spite of our previous holdings in LeRetilley and Nelson to the contrary. So now we have a fundamental error exception for unobjected golden rule "plus" argument.
To understand the extent of the panel's departure, I turn back to the precedents themselves. As quoted in Judge Letts' opinion in LeRetilley, plaintiff's lawyer argued:
"What does he do on each day that he walks that mile? He knows today and tomorrow morning when he gets up, after you have rendered this verdict, he's going to go to work and he's going to know there is nothing he can do at work except be a helper.... How is he going to break that routine? He has got to live with that. He can't because they gave him an 84 IQ. God gave him a 104 IQ. Their negligence gave him an 84 and he'd take it back. You could not give him enough money to sit here with an 84 IQ for the next 50 years.
"His life expectancy from today is, his life expectancy is 70, so that he's got to look forward to getting up every morning and walking that mile with that 84 IQ knowing that the day holds the same thing for him and the day after that. How would you like to be on jury duty the rest of your life? I know when you got your call for jury trial, `Oh, can't you get me out of this?' Well, he's sentenced to this for the rest of his life and there's nothing he can do about it."
354 So.2d at 1214. Judge Letts then described this argument in the following way:
"There is little doubt that the above represent an effort by counsel to have the jury put themselves in the shoes of the injured party and have the jurors personally identify themselves with the injuries. As such, they collectively constitute improper, so called, `golden rule' arguments." [e.s.]
354 So.2d at 1214.
Plainly, the "end-hog-hunting" argument in this case asked the jurors personally to identify themselves with the defendant and those who want to hunt for hogs in Okeechobee county. Actually the argument about the end of hog hunting is an economic appeal, rather than an appeal to racial, religious or *1026 ethnic bias. It implies that a verdict for plaintiff will cause local farmers to end their former willingness to allow hunters on their property during hunting season, which necessarily means that Okeechobee's former hunters will then have to drive to the neighboring counties to hunt their prey. What we confront in this case is, therefore, at the very worst merely an appeal to economic or sporting interests, or to personal convenience. So analyzed, the argument cannot be seriously equated to a call on the worst devils of human nature.
In LeRetilley, we categorically rejected the notion that an argument to the personal interests of the jurors was somehow so different from other kinds of improper arguments that we should excuse the rule requiring a contemporaneous objection:
"* * * we are lastly required to examine the law and decide if `golden rule' arguments constitute fundamental errors, reversible without objection. We find no Florida case that has tackled the issue head on, although there is dicta which would suggest that golden rule arguments may so constitute. Thus, the court in Stewart v. Cook, 218 So.2d 491 (Fla. 4th DCA 1969), held that statements such as:
1. `We can always say: "There but for the Grace of God, go I."
2. In the light of your own circumstances. All of us. Do we always check our brakes before we start out? I don't. I am sure you don't either.
3. Would you and I expect that on our own cars, all things being equal, are we supposed to get out and look under it every time we go down to the grocery store?'
"which were not objected to, `did not strike at that sensitive area of financial responsibility and hypothetically require the jury to consider how much it would wish to pay or receive.' Id. at 494. Inferentially, however, we can assume that if the remarks had struck the sensitive area they would have been preserved regardless of lack of objection.
"In the case at bar, several of the quoted excerpts do, most assuredly, strike at the `sensitive area' and accordingly under the Stewart dicta would constitute reversible error regardless of failure to object. We decline to follow this dicta and note that in the lead case on the golden rule, there was an overruled objection and the court merely noted that failure to ask for a curative instruction or make a motion to have the jury disregard it was not fatal, in view of the fact that an objection had been made. Bullock v. Branch, 130 So.2d 74, 77 (Fla. 1st DCA 1961). We note the language of the Florida Supreme Court in Baggett v. Davis, 124 Fla. 701, 169 So. 372 (1936) wherein the court said:
"A verdict will not be set aside by an appellate court because of such remarks or because of any omission of the judge to perform his duty in the matter, unless objection be made at the time of their utterance. This rule is subject to the exception that, if the improper remarks are of such character that neither rebuke nor retraction may entirely destroy their sinister influence, in which event a new trial should be awarded regardless of the want of objection or exception." Id. 169 So. at 379.
"In the case at bar we reject the argument that the remarks were of such sinister influence as to constitute irreparable and fundamental error. We have reviewed innumerable definitions of the phrase `fundamental error' and find the one that suits us best to be:
"A reviewing court may consider questions raised for the first time on appeal if necessary to serve the ends of substantial justice or prevent the denial of fundamental rights. This rule is peculiarly applicable in criminal cases and especially in capital cases." 5 Am.Jur., Appeal and Error, § 549.
"We cannot see that the ends of substantial justice were thwarted in the case at bar. The improper remarks did not create the injuries, nor did they strike at the theory of the liability of the case. True, they (the remarks) may have caused the jury to become more personally involved on the issue of damages than they should have been but such is not so sinister as to constitute a denial of fundamental rights." [e.s.]
*1027 354 So.2d at 1215.
In Nelson we again refused to waive the requirement of an objection, even though there were "innumerable examples of improper comment and argument." 368 So.2d at 361. We stated our policy in such matters in unmistakable terms: "[w]e perceive very few instances where remarks by an attorney are of such sinister influence as to constitute reversible error, absent objection." [e.s.] Id. Elaborating on our role as appellate judges, we said:
"We view, with some skepticism, appellant's agonized cries that comment by opposing counsel below deprived him of a fair and impartial trial, when not so much as an objection was deemed necessary upon the occasion of the supposedly fatal utterances. We must assume that silence from experienced counsel is a judgment play predicated on his or her concept of how the trial is going. As such the failure to object constitutes intentional trial tactics, mistakes of which are not to be corrected on appeal simply because they backfire, save in the most rare of circumstances, Haist v. Scarp, 351 So.2d 1120 (Fla. 4th DCA 1977). But see Akin v. State, 86 Fla. 564, 98 So. 609, 612 (1923)."
368 So.2d at 362.
There is but one way to describe the holdings in LeRetilley and Nelson. They manifestly stand for the proposition that an argument urging a civil jury, as here, to decide the issues on the basis of some personal considerationsuch as one's desire to hunt for hogs in the home countymay very well be improper, but any lingering effects of such an argument may be dissipated if an objection is timely made. If the error may be corrected by the timely intervention of the trial judge, then it simply cannot be considered fundamental error. The holdings are plainly that such arguments are not so malevolent that "neither rebuke nor retraction may entirely destroy their sinister influence." LeRetilley, 354 So.2d at 1215. While the opinions recognize the possible use of fundamental error to review other kinds of unobjected closing argument, they do not allow for its use where this kind of argument is at issue.
The panel's proposed opinion in this case is directly in conflict with LeRetilley and Nelson in its presumption that the trial judge could not have cured this attempt to appeal to the "sportin' life" of the jury. Well, to borrow again from Gershwin, "it ain't necessarily so." There is no attempt in the panel's opinion to compare the argument in this case to one of the more classic appeals to the basest of human instincts: e.g. rank appeals to racial, religious or ethnic prejudice. The opinion stands on mere ipse dixit in its unsupported conclusion that the end of hog hunting in Okeechobee county is comparable to loathsome appeals to racial or religious prejudice, the kind of arguments to which the use of fundamental error is limited. In fact, this aspect of the holding actually has the effect of perversely denigrating the judiciary's commitment to eradicating the effects of racial and religious prejudice in our courts. By comparing so tepid an invocation to personal sporting convenience and pure economic interests with the poison of racial or religious prejudice, the panel's decision threatens to trivialize the latter.
Additionally, the opinion ignores the fact that the judge on the scene apparently concluded that the jury regarded the argument as little more than rhetorical hyperbole and that the verdict was the result of the evidence rather than the argument. The panel's contrary conclusion will be understood by the trial bench and bar as a holding that panels of this court will apply their own subjective criteria to unobjected final arguments in civil cases, no matter what the trial court and jury decide. That is not only at odds with LeRetilley and Nelson, but it is also inconsistent with the supreme court's own usage of fundamental error.
One of the earliest of the cases discussing fundamental error is Hamilton v. State, 88 So.2d 606 (Fla.1956).[1] There the defendant *1028 was convicted of lewd fondling of a young child. At his trial a written statement given by him to the police was adduced, which the trial judge characterized as a "confession" in his instructions to the jury. Defendant failed to object to the court's description. On appeal he argued that the trial court committed fundamental error in giving the instruction. In affirming his conviction, the court said:
"We do not here intend to hold that it was not error to refer to the statement as a confession when in actuality it was not a confession. We do, however, hold that, in view of the record, the error was not such as to justify a reversal in the absence of a timely objection and an assignment grounded thereon.
"We do not consider an error to be of such fundamental nature as to justify a reversal in the absence of timely objection unless it reaches down into the legality of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the error alleged.

"Illustrating the rule which we here announce is the opinion of the Supreme Court of the United States in Brown v. State of Mississippi, 297 U.S. 278, 56 S.Ct. 461, 465, 80 L.Ed. 682. There, as in Harrison v. State, supra, the State in a prosecution for first degree murder depended entirely upon a confession as the basis for a conviction. Aside from the confession, there was no evidence sufficient to warrant submitting the case to the jury. The record revealed that the confession was obtained by coercion and brutality. On appeal to the United States Supreme Court, it was held that even in the absence of a proper motion for the exclusion of the confession, the appellate court could nevertheless consider the error committed in admitting the confession into evidence in view of its obviously involuntary character. The Court pointed out that the complaint was not for the commission of a mere error `but of a wrong so fundamental that it made the whole proceeding a mere pretense of a trial and rendered the conviction and sentence wholly void.' See also Orfield, Criminal Appeals in America, pages 95-98.
"In a case such as the one before us where there was abundant admissible testimony before the jury which, if believed, would justify the conviction, the error could well have been corrected upon a timely objection. However, even though the error was committed, the testimony that was offered aside from the written statement was adequate to sustain the conviction and a failure to object and assign on appeal leads us to the conclusion that error, such as there was, was waived. It did not so permeate the proceeding as to convert it into `a mere pretense of a trial' nor did it strike at the fundamental legality of the trial itself." [e.s.]
88 So.2d at 607-608.
The next illuminating case discussing fundamental error is Brown v. State, 124 So.2d 481 (Fla.1960), where the court considered whether fundamental error occurs in a first degree murder trial when the trial judge instructs the jury that lesser degrees of murder cannot be considered by them in determining guilt. After restating that it is peculiarly the function of the jury to decide the degree of guilt and reiterating that trial judges should instruct on all lesser degrees even without evidence of lesser culpability when instructing the jury in a first degree murder case, the court then explained:
"This is the rule which we have adopted in ascertaining whether we will view a particular error as fundamental. In Hamilton v. State, Fla., 88 So.2d 606, we specifically stated that in order to be of such fundamental nature as to justify a reversal in the absence of timely objection the error must reach down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error. For example, where the State relied entirely upon a confession to obtain a first degree murder conviction it was fundamental error for the trial judge to fail to *1029 advise the jury on the weight to be given a confession even though no such charge was requested. Harrison v. State, 149 Fla. 365, 5 So.2d 703.[[2]] Similarly, in one of the leading cases on this subject, Brown v. State of Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682, the Supreme Court of the United States concluded that a murder conviction was fundamentally erroneous when the state relied entirely on a confession and the trial judge had failed to ascertain its voluntary character. In both of these cases there was no other evidence which would have supported the conviction.
"On the other hand, in Thompson v. State, 154 Fla. 323, 17 So.2d 395, also a capital case, the trial judge failed to instruct on the weight to be given a confession. We held that this was not a fundamental error because there was other evidence adequate to sustain the conviction even in the absence of the confession.
"In the instant case there has been no contention that the error of the trial judge necessarily and inescapably produced the ultimate jury verdict. So far as this record reveals there was adequate evidence to sustain the conviction regardless of the error of the judge. In other words, the alleged error did not permeate or saturate the trial with such basic invalidity as to lead to a reversal regardless of a timely objection under Section 918.10(4), Florida Statutes, F.S.A." [e.s.]
124 So.2d at 484.
A civil case discussing fundamental error is Sanford v. Rubin, 237 So.2d 134 (Fla. 1970). The court's entire discussion is as follows:
"Numerous cases were cited by the District Court of Appeal sustaining the statement that the constitutionality of a statute could be raised for the first time on appeal as fundamental error. Upon examination of the authorities cited by the District Court of Appeal and those cited by respondents in their brief, it appears that the constitutional issue in each case involved fundamental error. These cases do not hold that every constitutional issue amounts to fundamental error cognizable initially upon appeal. Constitutional issues, other than those constituting fundamental error, are waived unless they are timely raised.
"`Fundamental error,' which can be considered on appeal without objection in the lower court, is error which goes to the foundation of the case or goes to the merits of the cause of action. The Appellate Court should exercise its discretion under the doctrine of fundamental error very guardedly. See Holman v. State, 97 Okl. Cr. 279, 262 P.2d 456; State v. Heisler, 58 N.M. 446, 272 P.2d 660; Goodhue v. Fuller, 193 S.W. 170, 172 (Tex.Civ.App.)." [e.s.]
237 So.2d at 137. One should carefully note that the court rejected argument that it was fundamental error even though the error involved constitutional requirements.[3]
Ray v. State, 403 So.2d 956 (Fla.1981), is perhaps the court's most expansive explanation of fundamental error. There the court began its discourse as follows:
"The main benefit to a defendant of having a procedural defect declared fundamental error is that such error can be considered on appeal even though not objected to in the lower court. The doctrine of fundamental error thus is an exception to the contemporaneous objection rule as set out in Florida Rule of Criminal Procedure 3.390(d). This Court has long applied rule 3.390(d) and its statutory predecessors to bar the appeal of instructions not objected to at trial. See Febre v. State, 158 Fla. *1030 853, 30 So.2d 367 (1947); Simmons v. State, 151 Fla. 778, 10 So.2d 436 (1942). Most recently, this Court applied the contemporaneous objection rule to the failure to object to instructions in Castor v. State [365 So.2d 701 (Fla.1978)]. In Castor we commented that

the requirement of a contemporaneous objection is based on practical necessity and basic fairness in the operation of the judicial system. It places the trial judge on notice that error may have been committed, and provides him an opportunity to correct it at an early stage of the proceedings." [e.s.]
403 So.2d at 960. The court then continued:
"This Court has previously refused to adopt an absolute rule that would allow a defendant to object for the first time on appeal. Clark [v. State, 363 So.2d 331 (Fla.1978)]. We refuse to do so in this instance as well. Fundamental error has been defined as `error which goes to the foundation of the case or goes to the merits of the cause of action.' Sanford v. Rubin, 237 So.2d 134, 137 (Fla.1970). The appellate courts, however, have been cautioned to exercise their discretion concerning fundamental error `very guardedly.' Id. We agree with Judge Hubbart's observation that the doctrine of fundamental error should be applied only in the rare cases where a jurisdictional error appears or where the interests of justice present a compelling demand for its application. Porter v. State, 356 So.2d 1268 (Fla. 3d DCA) (Hubbart, J., dissenting), remanded, 364 So.2d 892 (Fla.1978), rev'd. on remand, 367 So.2d 705 (Fla. 3d DCA 1979).
"An accused, as is required of the state, must comply with established rules of procedure designed to assure both fairness and reliability in the ascertainment of guilt and innocence. The failure to object is a strong indication that, at the time and under the circumstances, the defendant did not regard the alleged fundamental error as harmful or prejudicial. `It is well-established law that where the trial judge has extended counsel an opportunity to cure any error, and counsel fails to take advantage of the opportunity, such error, if any, was invited and will not warrant reversal.' Sullivan v. State, 303 So.2d 632, 635 (Fla.1974), cert. denied, 428 U.S. 911, 96 S.Ct. 3226, 49 L.Ed.2d 1220 (1976)." [e.s.]
Id.
I distinguish the single argument in this case about ending hog hunting from the pervasive improper arguments extending throughout the case in Seaboard Air Line R.R. v. Strickland, 88 So.2d 519 (Fla.1956). As the court itself explained there:
"While we are committed to the rule that in the ordinary case, unless timely objections to counsel's prejudicial remarks are made, this court will not reverse the judgment on appeal, however, this ruling does not mean that if prejudicial conduct of that character in its collective impact of numerous incidents, as in this case, is so extensive that its influence pervades the trial, gravely impairing a calm and dispassionate consideration of the evidence and the merits by the jury, this court will not afford redress." [e.s.]
88 So.2d at 523.[4] In contrast, the improper argument here was an isolated incident in a trial otherwise without misadventure.
Indeed the court itself followed Strickland in Tyus v. Apalachicola Northern R. Co., 130 So.2d 580, 588 (Fla.1961), where the court said:
"We are of the opinion that when the charge delivered by the trial judge is considered together with the fact that respondent failed to object to the alleged prejudicial remarks relied on by the District Court of Appeal as the basis for its holding on this issue, coupled with the fact that the alleged `prejudicial conduct' took place only during petitioner's closing argument and was not so extensive that its influence pervaded *1031 the trial, it is crystal clear this case should not have been reversed even for a new trial.
"Moreover, it is most significant that in the instant litigation the veteran and learned trial judge, who was in the milieu of the court room throughout the trial and who was therefore in a much better position than this court or the District Court to determine whether the alleged prejudicial remarks were actually `in effect' of such character, denied a motion for a new trial."
An example of a consideration of a claim of fundamental error that is consistent with supreme court precedent is found in Pinder v. State, 396 So.2d 272 (Fla. 3d DCA 1981), where the court said:
"We are unable to reach the merits of this question because the issue was not properly preserved for review by any objection or motion which asserted this particularized contention below. De La Cova v. State, 355 So.2d 1227 (Fla. 3d DCA 1978), cert. denied, 361 So.2d 831 (Fla. 1978), and cases cited. This rule is applicable and controlling in this case because of the real possibility that if the claim had been brought to the attention of the court and the prosecution, it might well have been obviated by the introduction of additional testimonyas, for example, by the victim's answer to a single specific question as to whether the implement in Pinder's hand was or was not a toy. We will not reverse on the basis of an initial appellate assertion of alleged error which even may have been cured if advanced at the time of trial. See, Marks v. Delcastillo, 386 So.2d 1259, 1266-67 (Fla. 3d DCA 1980), review denied, 397 So.2d 778 (Fla. 1981)."
396 So.2d at 272-273. In a footnote, the court added:
"By the very `act' of not objecting, the party who does not properly preserve error below necessarily takes his chances as to whether there was in fact any way in which the objection could have been obviated; in this case, whether the victim was indeed able to differentiate between a firearm and a toy. In other words, fundamental error may exist only when, as an essential precondition, it clearly and affirmatively appears that the result could not have been affected by the failure to object. See, Pait v. State, 112 So.2d 380 (Fla. 1959); Marks v. Delcastillo, infra, 386 So.2d at 1266-68." [e.s.]
396 So.2d at 273.
Applying all of these principles to the present case, I begin with the policy we applied in LeRetilley and Nelson: we will not find fundamental error in unobjected closing argument in civil cases involving "golden rule", or personal juror interests, kinds of arguments. Turning directly to the case at hand, in the first place and perhaps most important, the argument in this case is simply not the kind of improper argument that one can say is uncorrectable by appropriate action by the trial judge. Although some of us may believe that corrective action by the judge would probably not have been very effective, no one can reasonably say with the required degree of certainty that the verdict in this case "could not have been obtained without the assistance of the error alleged" or that "the error * * * necessarily and inescapably produced the ultimate jury verdict" or that it "clearly and affirmatively appears that the result could not have been affected by the failure to object." Hamilton, 88 So.2d at 607; Brown, 124 So.2d at 484; Pinder, 396 So.2d at 273.
Second, as the supreme court stated in Ray, appellate courts should apply fundamental error "quite sparingly." In Nelson we held that there are "very few" instances in civil closing argument that could amount to an indelible taint on the jury's capacity to decide the case fairly on the evidence and law. That means that the measuring device for fundamental error is not the personal qualms of judges having the lowest threshold of offense. In other words, if it is going to be applied at all in civil cases to unobjected closing argument, then the doctrine of fundamental error must "be applied only in the RARE cases where a jurisdictional error appears or where the interests of justice present a compelling demand for its application." Ray, 403 So.2d at 960.
The panel seems to justify its use of fundamental error to require a new trial in this *1032 case on something related to the role of appellate judges in controlling what they conceive to be a pattern or increasing incidence of "improper" or "excessive" arguments in civil cases. They are motivated by cases primarily from the Third District. The view is exemplified by decisions such as Borden, Inc. v. Young, 479 So.2d 850 (Fla. 3d DCA 1985), rev. denied, 488 So.2d 832 (Fla.1986), where the court stated that "it is no longer if it ever wasacceptable for the judiciary to act simply as a fight promoter, who supplies an arena in which parties may fight it out on unseemly terms of their choosing * * *." 488 So.2d at 851. See also Walt Disney World Co. v. Blalock, 640 So.2d 1156 (Fla. 5th DCA), rev. dismissed, 649 So.2d 232 (Fla. 1994); and Bloch v. Addis, 493 So.2d 539 (Fla. 3d DCA 1986).
It seems to me that the principal defect in these cases, as with the panel's decision, is that they use individual judges' subjective views as to the enormity of counsel violating ethical constraints in closing argument to cancel the essential ingredient of appellate review, namely that a party must first object or otherwise present an issue to the trial judge. Appellate review is, after all, just that: review, not the first view.
Moreover, a core element of appellate review in Florida is that error must be meaningful that is, affect the outcomebefore it can be the basis of a reversal for a new trial in a civil case.[5] An indiscriminate use of fundamental error to require retrials for unobjected closing argument is foreign to traditional concepts of appellate review. Doing so where there is no evidence that the error affected the outcome or verdict is itself a violation of the harmless error statute. It seems to me that it is possible to condemn offending lawyers' flouting of ethical prohibitions without making society pay for multiple trials in civil cases. No judge has ever explained why the ordinary Bar discipline process is not sufficient for lawyers who violate their ethical rules, or why society should bear the cost of repeat trials when opposing counsel did not think so much of the transgression as to raise it in front of the trial judge by a timely objection.
I do not share the views expressed in the cases relied on by the panel. I do not think that fundamental error should be used by appellate judges like officious schoolmasters whose personal taste in closing argument is for disputation that would not offend even the fragile sensibilities of a Victorian cleric. For me, closing argument in civil cases is a time for robust, vigorous, challenging, unrestrained skewering of an opponent's ideas. For me, closing argument is not a time for the timid, elliptical discourse of Thomistic scholars. As Judge Letts wrote in Nelson:
"while all judges are required by judicial dictates to exercise control over a trial, absent proper objections, neither trial, nor appellate judges, can be expected to take on the role of school teachers, continually correcting argument or comment unobjected to by opposing counsel."
368 So.2d at 361-362.[6]
The personal views of judges on what constitutes improper argument are as boundless among judges as they are among lawyers in general. It will not be very rare to find two judges whose unique sense of propriety is less tolerant than others. Reasonable judges will differ over the kind of argument used in this case: some will see it as this panel does; others will see it as I do. But, the above *1033 supreme court cases tell me quite clearly that fundamental error was never designed to be so amorphous. They tell me that it should be reserved for only those arguments that any judge would agree has destroyed any possibility that the jury can decide the case exclusively on the basis of the law and the evidence.
To repeat, it must "clearly and affirmatively appear that the result could not have been affected by the failure to object." Pinder, 396 So.2d at 273. The error in the argument must "reach down into the legality of the trial itself to the extent that a verdict * * * could not have been obtained without the assistance of the alleged error." Brown, 124 So.2d at 484. The argument must be "a wrong SO fundamental that it made the whole proceeding a mere pretense of a trial." Hamilton, 88 So.2d at 608.
Whatever we may personally believe about ending hog hunting in Okeechobee county, we simply cannot say with a straight face that such argument reaches down into the legality of the trial, or that it involves a wrong so fundamental that it made the whole proceeding a pretense of a trial. To do so is to believe that the citizens of Okeechobee county are incapable of distinguishing the odor of cow dung from french perfume. Although well-intentioned, it is, I fear, likely to be perceived as an elitist view, springing from an unrecognized bias that the poor, miseducated, southern or rural folk in Okeechobee county are incapable of grasping what only their privileged, properly educated, northern or urban guardians understand.
In this case, there was considerable evidence of plaintiff's own negligence. The judge who presided over the trial did not think that the unobjected argument had the irradicable effects required when the matter was brought up in a post trial motion. His decision represents a finding by the judge on the scene that the verdict was not influenced by defense counsel's overblown argument.
Trial lawyers read the same cases we do. They are aware of the above line of cases from our supreme court as well as our own decisions. They will not read the opinion of the panel without concluding that we have receded from LeRetilley and Nelson, even though the opinion does not refer to fundamental error or state that the older cases are no longer good law. They will conclude that they can now assert fundamental error even where timely corrective action may have erased the effects of an improper argument.[7]
I not only dissent from today's denial of en banc review, but I lament it.
STEVENSON, Judge, dissenting.
Because the task of defining the class of improper closing argument which rises to the level of fundamental error in civil jury trials is of exceptional importance and may have far-reaching implications for the trial bench and bar within the Fourth District, I dissent from the refusal of the majority of this court to consider this case en banc. I do not hesitate to file this brief dissent, because I believe it entirely appropriate for a judge to express, in writing, his or her reasons for concluding that an issue justifies the extraordinary procedure of full consideration by all members of the court.
Nevertheless, since the court has voted not to consider this case en banc, I find it unwarranted to speak either in support of or against the merits of the panel decision.
NOTES
[1] We agree with the trial court's conclusion that the juror's failure to disclose this familial relationship did not amount to improper concealment by the juror warranting reversal. Neither counsel asked any questions of the jury panel or this juror, individually, that should have alerted him to volunteer his familial relationship during voir dire. The insurance company was not named as a party, nor was the juror's brother named as a witness. Counsel did not ask the jurors whether they had any close friends or relatives employed by an insurance company. The fact that plaintiffs' counsel asked another juror about his relationship with Florida Farm Bureau was insufficient to have alerted the juror to disclose his relationship through his brother.
[2] He further testified that he told his brother he had received a subpoena to appear for the juror interview, to which his brother responded that "I knew you were probably going to get one." His brother told him the reason he was being subpoenaed was "because him and I were brothers and he had worked for Farm Bureau." Whether or not the juror knew of Florida Farm Bureau's relationship to the case before the return of the jury verdict, by the time the juror was asked to testify post-trial he most certainly was aware of this relationship.
[3] We also note that in this case, the trial court based its conclusion that the juror's conduct did not necessitate a new trial solely upon a transcript of the juror's deposition which had been filed prior to the hearing on the motion for a new trial. We believe that the inquiry by deposition alone was insufficient. Rather, in such a situation, a juror interview conducted by the trial judge would have been the proper procedure to follow. See Sconyers v. State, 513 So.2d 1113, 1117 (Fla. 2d DCA 1987). Although no rule of procedure requires that the inquiry be conducted in the presence of the court, the strong public policy against allowing litigants to harass jurors and the limited scope of any inquiry concerning jury deliberations compels us to conclude that this public policy is best served by a court-supervised interview. In this case, such a procedure would have assisted the trial court in accurately learning what had transpired between the juror and his brother directly from the juror, thus placing the trial court in a better position to determine whether further inquiry of the juror's brother or other agents of Florida Farm Bureau was warranted.
[4] If you are nice enough to let a group of people come out and pursue an activity they want to pursue, what do you get for it in return, you get a lawsuit. You get somebody coming in and asking for $400,000.

What is happening to our American system of justice if that is what is supposed to be justice?
Courts have held such comments on the perceived impact of personal injury cases on the court system to be improper attempts to appeal to the "conscience of the community and matters far afield from the evidence admitted." Bellsouth Human Resources Admin., Inc. v. Colatarci, 641 So.2d 427, 429 (Fla. 4th DCA 1994) (quoting Stokes v. Wet `N Wild, Inc., 523 So.2d 181, 182 (Fla. 5th DCA 1988)); see also Bosch v. Hajjar, 639 So.2d 1096 (Fla. 4th DCA 1994), and cases cited therein.
[5] Plaintiffs' lawyers love to get up here and fill out all these blanks here; seventy here, seventy-five thousand here; twenty-five thousand here. You know, the secret to that is to get up here and grab this stand just as hard and tight as you can and ask for just as much money as you can ask for and hope you don't turn people off.

As then-Judge Anstead, writing for this court, noted in Hartford Accident & Indemnity Co. v. Ocha, 472 So.2d 1338, 1343 (Fla. 4th DCA), petition for review dismissed, 478 So.2d 54 (Fla. 1985):
Suggesting that all claimants' lawyers always ask for more than they expect to receive or that defense lawyers always say their clients are innocent or that the damages are minor, adds nothing to the orderly resolution of the factual disputes before the jury, and does considerable harm to the already impaired reputation of the legal profession.... The trial court should not hesitate ... to keep tight reins on a lawyer who seeks to win his case by castigating an entire segment of the legal profession.
See also Bellsouth; Stokes.
[6] While we recognize the need for zealous advocacy, we agree with the language in Murphy v. Murphy, 622 So.2d 99, 102 (Fla. 2d DCA 1993): "We are cognizant of the glamorization of the `cowboy' litigator. We believe, however, that a trial by jury should not resemble a `Shoot-out at the OK Corral'."
[7] The third district, however, has granted a new trial where it finds that the unobjected-to comments of trial counsel constitute an ethical violation. See Martino v. Metropolitan Dade County, 655 So.2d 151 (Fla. 3d DCA 1995); Kaas v. Atlas Chem. Co., 623 So.2d 525 (Fla. 3d DCA 1993); Borden, Inc. v. Young, 479 So.2d 850 (Fla. 3d DCA 1985), review denied, 488 So.2d 832 (Fla. 1986); Schreier v. Parker, 415 So.2d 794 (Fla. 3d DCA 1982). The first and fifth districts have likewise been willing to reverse for the cumulative effect of remarks during closing argument which constitute ethical violations. See Sacred Heart Hosp. of Pensacola v. Stone, 650 So.2d 676 (Fla. 1st DCA 1995); Pippin v. Latosynski, 622 So.2d 566 (Fla. 1st DCA 1993). See also Silva v. Nightingale, 619 So.2d 4 (Fla. 5th DCA 1993); S.H. Inv. & Dev. Corp. v. Kincaid, 495 So.2d 768 (Fla. 5th DCA 1986), review denied, 504 So.2d 767 (Fla.1987); Murphy v. Murphy, 622 So.2d 99, 102 (Fla. 2d DCA 1993).

While in both Jeep Corp. v. Walker, 528 So.2d 1203 (Fla. 4th DCA 1988), and Lemoine v. Cooney, 514 So.2d 391 (Fla. 4th DCA 1987), review denied, 523 So.2d 577 (Fla.1988), we acknowledged the approach taken by the third district in Borden, in neither Walker nor Lemoine did we find that the misconduct sank to the depths of that encountered in Borden so as to deny the party a fair trial. The different approaches of the districts to unobjected-to improper remarks during closing arguments are set forth in a Florida Bar Journal article. See John W. Reis, Improper Jury Argument: Gilding the Lustre of the Golden Rule, Fla.B.J., Jan. 1995, at 60.
[8] For example, arguments expressing personal beliefs and opinions of the lawyers do not inherently appeal to the jury's passions or prejudice. But see Davies v. Owens-Illinois, Inc., 632 So.2d 1065, 1067 (Fla. 3d DCA), review denied, 641 So.2d 1346 (Fla.1994); Kaas.
[1] One notes straightaway that most of the cases in which the court has made an attempt to illuminate the usages of fundamental error are criminal. These cases are certainly a proper guide to the meaning of fundamental error in civil cases, however, because no one would suggest that the civil fundamental error rule should be applied to a less deplorable error than in criminal cases. In other words, the threshold for finding fundamental error must actually be lower in criminal cases to insure that an accused person's rights under the fourth, fifth and sixth amendments are not lost in the heat of the passion of closing argument.
[2] Although the court cites Harrison for the stated proposition, Harrison does not actually mention fundamental error.
[3] The court has never really explained what it meant by "error which goes to the foundation of the case or goes to the merits of the cause of action." The term "foundation" conceivably relates to jurisdictional defects. As to "error that goes to the merits of the cause of action," I believe (although I cannot find anything definitive to prove it) that the court had in mind what it has held in criminal cases: i.e., to be fundamental error, the court must be able to say without hesitation that without the error asserted the merits of the case would not have been decided as they were.
[4] When courts announce categorical rules, it is rare that they do not allow for the possibility some day not to apply the rule when some unforeseen need for justice suggests otherwise. It is an escape hatch for the rare, unique case. But the mere existence of the possible exception should not be understood by later judges as an invitation to erode the rule itself. Thus, the possibility that the failure to object to an argument might be excused in the rare case should not be understood as an open door for appellate judges to enlarge the exception.
[5] See § 59.041 Fla.Stat. (1995) ("No judgment shall be * * * reversed, or new trial granted by any court of the state in any cause, civil or criminal, on the ground of * * * any matter of * * * procedure, unless * * * the error complained of has resulted in a miscarriage of justice.")
[6] Neither is it a time for turning appellate judges into school principals policing the playground during recess, as suggested by the esteemed author of Borden: "the proper performance of our duties as judges may indeed require something more than letting the children settle their play-ground disputes among themselves." 479 So.2d at 851. While I agree that courtrooms are not sports arenas or the Roman Coliseum, I do not believe that necessarily means that judges should use their pulpits in them to rectify anything but the most egregious unobjected transgressions during civil trials. To my mind, as a justification for mistrials or new trials, violations of the ban against golden rule arguments, like violations of the proscription against a lawyer stating personal beliefs as to the truthfulness of a witness, is the weakest of all possible reasons.
[7] The panel does not recognize what the trial judge might have been able to do if a timely objection had been interposed. For example, the judge could have told the jurors here that the argument was improper, that it invited them to decide the case on their own feelings, and that the law requires them to decide it only on the evidence and law. The court could then have individually interrogated each juror to determine if the juror could put aside the remark and decide the case in the manner provided by law. If the judge was then unsatisfied with any juror's response, the court could then consider a mistrial.