**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5562-17T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

WOODROW MILLER,

     Defendant-Appellant.

_____

> Argued October 7, 2019 – Decided November 13, 2019
>
> Before Judges Fasciale, Rothstadt and Moynihan.
>
> On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 10-06-1174.
>
> Andrew R. Burroughs, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Andrew R. Burroughs, on the briefs).
>
> Erin M. Campbell, Assistant Prosecutor, argued the cause for respondent (Esther Suarez, Hudson County Prosecutor, attorney; Erin M. Campbell, on the brief).

PER CURIAM

Defendant appeals from a May 24, 2018 order denying his petition for post-conviction relief (PCR).[1] Defendant primarily contends that his trial counsel rendered ineffective assistance by failing to conduct a meaningful pre-trial investigation. And—understanding that the manner and the cause of death were critical, and that the victim indisputably made multiple diary entries showing that she previously attempted suicide and admitting that she wanted to kill herself and defendant—defendant also maintains that his trial counsel failed to at least consult experts in the fields of pathology, psychology, crime scene analysis, and ballistics. That is especially so because the State's case depended on the testimony from its expert pathologist.

On appeal, defendant raises the following points:

POINT I

---

[1] The jury found defendant guilty of first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (a)(2); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); fourth-degree possession of a defaced firearm, N.J.S.A. 2C:39-3(d); third-degree hindering apprehension, N.J.S.A. 2C:29-3(b)(1); and fourth-degree obstruction of justice, N.J.S.A. 2C:29-1. After the appropriate mergers, the judge imposed a concurrent prison term of fifty-five years, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, consecutive to five years' incarceration with two and one-half years' parole ineligibility. We upheld the convictions and sentence. State v. Miller, No. A-0124-14 (App. Div. Oct. 4, 2016). The Supreme Court denied certification. State v. Miller, 228 N.J. 478 (2017).

AS DEFENDANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL, HE WAS ENTITLED TO [PCR].

> [A]. Trial counsel failed to investigate whether a forensic pathologist was required to rebut the State's expert.

> [B]. [Trial] counsel was ineffective by failing to present an expert witness in forensic pathology to rebut the State's . . . medical expert.

> [C]. [Trial] counsel failed to investigate whether experts in ballistics, crime scene, and blood[-]splatter analysis would have aided the defense.

> [D]. As [the victim's] state of mind was a material fact in dispute, [trial] counsel was ineffective when he failed to investigate whether an expert in forensic psychology was required.

> [E]. [Trial] counsel's cumulative errors denied [d]efendant effective legal representation.

POINT II

AS DEFENDANT WAS CONVICTED BY UNRELIABLE AND QUESTIONABLE SCIENTIFIC EVIDENCE, BASIC FAIR PLAY AND

FUNDAMENTAL FAIRNESS REQUIRE A NEW TRIAL.[2]

We reverse.

## I.

Defendant and the victim were in a dating relationship. The shooting occurred once they arrived at an apartment after school. Defendant called 9-1-1 and stated:

> [A] girl just shot herself. . . . She was my friend. This is my girlfriend. . . . She did it to herself. She just got upset. She said [she] don't want to live anymore. I don't know where she g[o]t the gun from, but she just shot herself in the head. . . . [She is] still breathing.

The dispatcher told defendant to apply a cloth to the victim's wound. Police arrived at the apartment, but no one answered the front door. They contacted the dispatcher, who called defendant to inform him that police were there. Police entered and found the victim—still alive—in a back bedroom with a gunshot wound to her head. Defendant also had a gunshot wound to his arm. The victim was seventeen years old.

---

[2]  We conclude this argument is barred on this appeal because it was not presented to the PCR judge. <u>See</u> <u>Nieder v. Royal Indem. Ins. Co.</u>, 62 N.J. 229, 234 (1973).

An officer saw a gun on the bed, and without wearing gloves, placed it on the floor. Police did not test the gun for fingerprints. In the bedroom, they found a Clorox bottle, a bullet hole in the wall, bloody bedding, a blanket, and pillow shams and clothing in a laundry bag. They also found a shell casing in a bathroom toilet.

At the scene, defendant told police that he and the victim argued about his involvement with another girl, the victim pulled out a gun from her pocketbook, the couple struggled over the gun, and then she shot herself in the head. An officer described defendant as being unfazed, unemotional, and without any tears or shaking. The initial police report indicated that the shooting was an "apparent suicide."

The incident's investigation did not involve DNA testing of the blood found on the gun or the blood-splatter on the wall. At the scene, police found two spiral notebooks in the victim's pocketbook, one with a green cover and the other with a red cover. The one with the green cover—a diary—contained the victim's handwriting, including multiple entries about her desire to kill herself and defendant. This is a sampling of some of the entries.[3]

---

[3] Grammatical and spelling errors are in the original.

I can't live inside myself knowing I'm not happy wat so eve.  I cried today.  I'm tired of crying.  The red means death.  I wanna kill Woodrow Jason Miller.

. . . .

I sometimes see myself rolling my eyes to the back of my head as if I'm about to die.  I wish I could at times.

. . . .

F*** outta here DATS sad okay wood I now know how to act wit you wood you F***** losers, DATS it.  F*** you 4 real yo you aint.  KILL ME before I kill you! Please?

. . . .

Wood I tried 2 kill myself n survive it no matter how many pills I tried to s[w]allow or chemicals, drunk I'm still here.  Wood I tried to kill myself over a boy.  Now I done a lot of things in da past 2 end my life 4 many reasons but 4 a nigga dat don't care if I was dead or alive come on now.  I love you I truly . . . do.  But I sat in da hospital and wonder wat if I didn't survive wat would he have done then.  I think dat I've never been happy, why?  Because a couple of days ago I tried to commit suicide.  I'm willing to kill myself ova you . . . what girl you know eva went dat far, not just said it but got papers to prove it.

. . . .

Now Im only telling you this last time.  Imma get what you want, but you better not f*** me ova or this time around Im really gonna kill you.  And I put it on my grand mother grave.

6

The State's case hinged on testimony from its medical examiner, Dr. Junaid Shaikh, who was not board-certified by the American Board of Pathology. He opined that the cause of death was homicide by a bullet that entered the victim's head on the right side and exited the left side. He located two contusions on the left side of the victim's neck: one on the base near the thyroid and the other on the right side. Dr. Shaikh did not determine when the bruising occurred. He found a bullet-graze wound on the dorsal side of the victim's left hand, between her thumb and forefinger, but no gunshot residue testing was performed on the victim's or defendant's hands. He took fingernail scrapings from the victim's hands, but did not send them to a laboratory for testing. According to Dr. Shaikh, the death was likely instantaneous.

Usually, Dr. Shaikh would determine the cause of death on the day of the autopsy, but he did not do that here. Instead, he certified the death as a homicide after speaking to an assistant prosecutor. Dr. Shaikh admitted he did not see the victim's diary until shortly before trial. At trial, he described the diary entries as "all kinds of ramblings" and said he could not "make heads or tails" of them. He admitted he was not qualified as a psychologist to interpret the entries.

In the PCR petition, PCR counsel argued trial counsel failed to (1) investigate and consult with an expert in forensic medicine/pathology to rebut

the State's expert; (2) investigate whether experts in ballistics, crime scene, and blood-splatter would have aided the defense; and (3) produce testimony from an expert forensic psychologist. PCR counsel also contended that the cumulative errors by trial counsel denied defendant a fair trial. Defendant also raised several pro se claims of ineffective assistance of counsel.[4]

The PCR judge conducted an evidentiary hearing, at which two witnesses testified: a defense forensic pathologist and neuropathologist, Dr. Zhongxue Hua, M.D., PhD; and defendant's trial counsel. As part of defendant's PCR petition, Dr. Hua's expert report was produced, in which he offered scientific reasons for the manner and the time of death.

Dr. Hua said that the death was not a homicide. Based on the available investigative material, he instead concluded that the manner of death was indeterminate. He noted the police investigation was poorly executed because

---

[4] Defendant raised the same arguments relating to trial counsel's failure to consult or call expert witnesses. Defendant also argued trial counsel was ineffective because counsel failed to: (1) move to dismiss the indictment on grounds that police contaminated the crime scene, thus preventing fingerprint testing on the gun; (2) object to the State's witness' perjured testimony and cross-examine that witness, prevent defendant from testifying, and submit defendant's video statement; (3) submit the victim's entire diary; (4) request the lesser-included offense of passion-provocation manslaughter jury charge; (5) move for a mistrial on the grounds that the guilty verdict was against the weight of the evidence; and (6) object to prosecutorial misconduct.

there was no DNA analysis, ballistic testing, nor blood-splatter analysis. He said that it was undetermined whether the single "recovered projectile could be from either the fatal shot to [the victim's] head, the non-fatal shot to [the victim's] left hand, or [the] non-fatal shot to [defendant's] left forearm."

Dr. Hua said it was possible that three shots were fired from the gun: into defendant's left forearm, into the victim's left hand, and into the victim's head. He indicated that the State did not measure the distance from the wound to the victim's hand, and that it was not examined properly or addressed by "gross examination, histopathology examination, and/or gunpowder residue testing." He noted that Dr. Shaikh did not perform a histopathology to determine the age of the victim's bruises to rule out "the probability of any pre-existing bruises," which Dr. Hua stated could have "occurred before, during, or after [the victim's] two gunshot wounds."

Dr. Hua admonished Dr. Shaikh for disregarding the diary before or during a final determination of the manner of death. Dr. Hua emphasized that Dr. Shaikh dismissed the notebooks without offering any scientific basis or forensic reasoning. Instead, Dr. Hua recommended a formal consultation regarding the books with a forensic psychologist or psychiatrist. He said Dr.

Shaikh ignored the victim's state of mind, and that his conclusion as to the manner of death was simply "wrong."

Dr. Hua examined over 300 photographs and placed significant importance on three, which depicted the clothing that defendant wore during the shooting. Blood drips appeared only on the left side, which Dr. Hua found significant because defendant's gunshot wound was on that side. But Dr. Hua believed that the pictures did not support the State's theory—that defendant had the victim in a headlock and shot her. According to Dr. Hua, if that theory was correct, blood-splatter would have appeared on the right side of his clothing. The physical evidence therefore did not show that defendant—as the State contended—laid on top of the victim, placed the victim in a headlock, and shot her on the right side of her head.

Although Dr. Shaikh opined that the death was instantaneous, Dr. Hua said that, scientifically, that could not be correct. Dr. Hua explained that there was no direct damage to the main portion of the victim's brain structure, meaning that involuntary breathing and blood circulation would have continued after the head wound. Indeed, defendant told the 9-1-1 dispatcher that the victim was still breathing, and the record reflects that hospital personnel treated her for hours. Dr. Hua concluded that the bruising could have occurred after the victim

10

was shot. According to Dr. Hua, the timing of the victim's neck wounds would have been common knowledge to qualified medical examiners.

Trial counsel also testified at the PCR hearing, verifying that his defense was that the victim committed suicide. Even though trial counsel conceded that Dr. Shaikh was not a "strong expert," he did not consult a blood-splatter expert. He admitted that a blood-splatter expert would have helped the defense to show where defendant was standing when the victim shot him, and he stated that he did not consult ballistic or psychological experts. He could not recall if he consulted a crime scene expert or an expert in forensic pathology. Trial counsel testified that, although it was his practice to consult a forensic pathologist if he thought the State's expert—like here—would not be a strong witness, he could not recall if he did so here. And there is nothing in the record to suggest he did.

II.

Where the PCR judge has conducted an evidentiary hearing, we "necessarily defer to the [PCR judge's] factual findings." State v. O'Donnell, 435 N.J. Super. 351, 373 (App. Div. 2014). We review the legal conclusions of the PCR judge de novo. State v. Harris, 181 N.J. 391, 419 (2004). Our review is de novo because the judge denied the PCR petition, concluding that trial

counsel exercised reasonable trial strategy by not consulting with the proposed experts.

The law pertaining to ineffective assistance of counsel is settled. To determine whether trial counsel rendered ineffective assistance of counsel, we turn to the constitutional standards set forth by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984), which the New Jersey Supreme Court adopted in State v. Fritz, 105 N.J. 42 (1987). In Strickland, the Court announced a two-part test that a defendant must demonstrate:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
>
> [Strickland, 466 U.S. at 687.]

As to prong one, we consider whether counsel's conduct fell below an objective standard of reasonableness. Id. at 688. A defendant must show that counsel's actions were beyond the "wide range of professionally competent assistance." Id. at 690. The law presumes that counsel rendered effective assistance. Ibid. When considering challenges to the effectiveness of counsel,

12

our "task is to fairly assess . . . trial counsel's decisions in the context of the State's case against defendant and the strengths and weaknesses of the evidence available to the defense." State v. Pierre, 223 N.J. 560, 579 (2015). The "quality of counsel's effectiveness" is based on the "totality of counsel's performance in the context of the State's . . . evidence of defendant's guilt." State v. Marshall, 123 N.J. 1, 165 (1991). Importantly, "[a]n ineffective assistance of counsel claim may occur when counsel fails to conduct an adequate pre-trial investigation." State v. Porter, 216 N.J. 343, 352-53 (2013). As to counsel's pre-trial investigation, our inquiry is whether counsel's performance was "reasonable considering all the circumstances." Strickland, 466 U.S. at 688.

To show prejudice under prong two, there must be a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. We focus on the "fundamental fairness of the proceeding whose result is being challenged." Id. at 696. "If counsel's performance has been so deficient as to create a reasonable probability that these deficiencies materially contributed to defendant's conviction, the constitutional right will have been violated." Fritz, 105 N.J. at 58.

We understand that our inquiry is whether counsel's performance was "reasonable considering all the circumstances." Strickland, 466 U.S. at 688. We fully appreciate that if counsel thoroughly investigated the law and the facts, and considered all possible options, then counsel's trial strategy is "virtually unchallengeable." Id. at 690-91.

Trial counsel was experienced and skillfully cross-examined Dr. Shaikh, but even the "'exercise of the utmost skill during the trial is not enough if counsel has neglected the necessary investigation and preparation of the case or failed to interview essential witnesses or to arrange for their assistance.'" Fritz, 105 N.J. at 63-64 (quoting Moore v. United States, 432 F.2d 730, 739 (3d Cir. 1970)). Strategy decisions made after a less-than-complete investigation are subject to closer scrutiny. State v. Savage, 120 N.J. 594, 618 (1990). Indeed, counsel had a duty to make "reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. A failure to do so renders counsel's performance deficient. And that is at the heart of defendant's PCR petition.

In our view, not calling or consulting any expert, especially a forensic pathologist, is not "reasonable considering all of the circumstances." Trial counsel did not conduct an appropriate pre-trial investigation. Counsel believed

14

Dr. Shaikh would not be a "strong expert," and it was therefore his practice to consult with a different expert in preparation for trial. He explained that ordinarily, he would then determine whether to retain a competing expert.

Trial counsel acknowledged that Dr. Shaikh's testimony was significant because Dr. Shaikh determined the victim's manner of death was a homicide, rather than a suicide; yet, counsel could not recall whether he ever consulted—informally or formally—with a forensic pathologist in this case. He did not have any notes of any consultation, and he did not request that the Public Defender's Office retain any expert. According to defendant, he asked trial counsel to retain an expert, but was told that the Public Defender's Office would not pay for one. Without consulting another expert, trial counsel, arguably, was unprepared to cross-examine Dr. Shaikh.

We therefore conclude that defendant demonstrated prong one of Strickland because his counsel did not consult with a forensic pathologist; instead, he relied solely on his ability to cross-examine Dr. Shaikh. We emphasize that our Court made clear that even the "utmost skill during the trial is not enough if counsel has neglected the necessary investigation and preparation of the case or failed to interview essential witnesses[.]" Fritz, 105 N.J. at 63-64 (internal quotation and citation omitted). This is especially

15

important because the State's case rested on Dr. Shaikh's conclusions that the manner of death was a homicide and that the victim died instantaneously.

We also conclude defendant satisfied the second prong of Strickland because had trial counsel consulted with Dr. Hua, for instance, he arguably would have been better equipped—scientifically—to cross-examine Dr. Shaikh. There is a reasonable probability that if counsel consulted with a forensic pathologist, the result of the proceeding would have been different. Dr. Hua arguably undermined the scientific basis for Dr. Shaikh's opinions as to the manner and the time of death due to the lack of forensic evidence. He stressed the importance of blood only appearing on the left side of defendant's clothing, indicating that defendant was shot in the arm while standing. Dr. Hua emphasized that the absence of blood-splatter on defendant's right side signified he was not laying on top of the victim, as the State contended. And he highlighted the victim's own words in her diary in which she stated she wanted to kill herself and defendant. Such evidence would have likely raised reasonable doubt even before introducing rebuttal testimony from a forensic psychologist, a ballistic expert, or a blood-splatter expert.

Moreover, had trial counsel produced testimony from a forensic pathologist, such as Dr. Hua, the expert witness arguably would have undercut

16                                                                                          A-5562-17T4

Dr. Shaikh's conclusions. Unlike Dr. Shaikh, Dr. Hua considered the diary entries before determining the manner of death. Dr. Hua may have countered Dr. Shaikh's opinion that the bruises occurred before the victim's death by highlighting that Dr. Shaikh failed to perform any microscopic analysis to establish the age of the bruises. He may have contradicted Dr. Shaikh's testimony about the time of death and the bruises by showing that the victim's involuntary breathing continued for a substantial period of time, and that the marks on the victim's neck were caused by the hospital's administration of the breathing tube. Undercutting Dr. Shaikh's opinions was especially important here because he was unable to provide specific support for his conclusion that the death was a homicide, other than by saying "[i]t's based on the circumstances—and there's nothing specific I can tell you—and the examination, itself. It was my opinion that the manner of death [was] a homicide."

A forensic pathologist (or even a blood-splatter expert) may have directly interpreted the meaning of defendant's wound on his elbow. That is, as to the blood drips on defendant's left side of his tee shirt, rather than any blood on the right side. The State contended that defendant was laying on top of the victim and had her in a headlock when he shot her in the head. Dr. Hua's testimony

may have shown that defendant was standing when the victim shot him. In other words, the blood drips on only the left side (front and back) of his tee shirt and pants was inconsistent with the State's theory.

Trial counsel told the jury he was not a medical examiner, but attempted to explain how the victim sustained a gash between her index finger and thumb. Trial counsel argued in summation that the wound to the victim's hand did not occur as a result of a bullet—contrary to Dr. Shaikh's opinion and without any scientific evidence. Rather, trial counsel told the jury "[e]xamine the gun. If you don't know what you're doing, you'll see the grooves in the gun that [caused] that gash." But Dr. Hua disagreed with trial counsel's speculation. Dr. Hua opined, like Dr. Shaikh, that a bullet caused the gash. Trial counsel would have avoided making such an assertion about the cause of the gash if, at a minimum, he consulted with a forensic pathologist or a medical examiner in preparation for trial. He brought further attention to Dr. Shaikh's unrebutted testimony by telling the jury he was not a medical examiner.

Another reason for trial counsel to produce testimony from—or at least consult with—a forensic pathologist is that defendant himself pointed out that the investigation was incomplete, and he requested counsel retain an expert. Shortly after trial, defendant wrote a letter to the Public Defender's Office, in

18

which he maintained his innocence and explained what he perceived to be a faulty investigation on the part of law enforcement and his trial counsel. He wrote, "I specifically asked for [an] expert. [Trial counsel] said [the] '[P]ublic [D]efender['s] [O]ffice is not go[ing to] pay for that.'" Without retaining an expert, the State's case was "essentially about unrebutted scientific evidence."

It is clear to us that Dr. Hua opined that—from a scientific medical perspective—the evidence he reviewed was inconclusive to establish the manner of death, which in-and-of-itself may have created reasonable doubt in the jurors' minds. Had trial counsel consulted with a forensic pathologist, counsel may have more fully investigated the case (with experts in ballistics, crime scene, and psychology). He would have had expert forensic insight into problems associated with: (1) the lack of testing of the blood on the wall, DNA, and gunshot residue; (2) the height differentiation between defendant and the victim; and (3) the importance of the victim's multiple diary entries.

As to the diary, a consultation with a forensic psychologist may have emphasized the need for a psychological autopsy, especially since the victim purportedly lost weight, tattooed defendant's name on her back, and was emotionally troubled. In fact, trial counsel may have unknowingly highlighted this point in his summation when he stated:

19

> I submit to you, ladies and gentlemen, [eighty-five] pounds is light. And if we were to do our job as a Medical Examiner, the first question would be, how much does this girl weigh? Was she going through any psychological problems, because weight loss would be indicative of that. And that's part of the entire picture. You can't investigate in a vacuum, ladies and gentlemen, you cannot.

Indeed, Dr. Shaikh conceded he was not qualified in forensic psychology. And neither side undertook a psychological investigation of the victim, including her diary entries.

III.

Finally, even if any one of the above deficiencies failed to warrant a reversal, we agree with defendant that trial counsel's cumulative errors were prejudicial and resulted in an unfair trial.

In State v. Orecchio, 16 N.J. 125 (1954), our Supreme Court established the concept of cumulative errors warranting reversal. The Court stated, "where any one of several errors assigned would not in itself be sufficient to warrant a reversal, yet if all of them taken together justify the conclusion that defendant was not accorded a fair trial, it becomes the duty of this court to reverse." Id. at 134 (internal quotation and citation omitted); see also State v. Jenewicz, 193 N.J. 440, 473 (2008) (indicating "[w]e have recognized in the past that even when an individual error or series of errors does not rise to reversible error,

when considered in combination, their cumulative effect can cast sufficient doubt on a verdict to require reversal").

We fully appreciate that a defendant is entitled to "a fair trial but not a perfect one." Lutwak v. United States, 344 U.S. 604, 619 (1953); accord Marshall, 123 N.J. at 169-70. "Trials, particularly criminal trials, are not tidy things. The proper and rational standard is not perfection; as devised and administered by imperfect humans, no trial can ever be entirely free of even the smallest defect." State v. R.B., 183 N.J. 308, 333-34 (2005). But here, the errors taken together show that defendant did not receive a fair trial. Trial counsel's lack of training in forensic pathology and the particular facts of this case can lead us to no other conclusion. Of course, the outcome of a new trial will depend on the evidence presented.

Reversed and remanded for further proceedings consistent with our opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION